[S. F. No. 11376. In Bank.—March 4, 1925.]

THE PEOPLE, etc., Appellant, v. MONTEREY FISH PRODUCTS COMPANY (a Corporation), Respondent.

[1] Constitutional Law — Invalid Proviso of Statute — Effect on Act—Rule.—The general rule is that when a proviso in the nature of an exception to a general statute is invalid, the general provisions of the statute are not invalidated thereby, unless it clearly appears that the provisions of the exception are so intimately and inherently related to and connected with the general provisions to which it relates that the legislature would not have enacted the latter without the former.

[2] Id.—Attack on Statute—Reasonableness and Fairness of Act—Presumptions.—When a legislative enactment is attacked upon the ground that it is arbitrary, unreasonable and discriminatory and constitutes special legislation, violating the prohibition of both the state and federal constitutions, all presumptions and intendments are in favor of the reasonableness and fairness of the legislative action, and the decision of the legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary.

[3] Fish and Game — Public Policy — Protection. — The public policy of this state in relation to the food fish within its waters is aimed at its protection and conservation for the benefit of the present and future generations of the people

---

1. Effect of partial invalidity of statutes relating to fish and game, note, Ann. Cas. 1916D, 55. See, also, 6 R. C. L. 129; 5 Cal. Jur. 647.

2. See 6 R. C. L. 78; 5 Cal. Jur. 615.

3. Government control over right of fishery, notes, 39 L. R. A. 581; 60 L. R. A. 481; L. R. A. 1916E, 523. See, also, 11 R. C. L. 1041; 12 Cal. Jur. 550.

of the state and the devotion of such fish to the purposes of human consumption.

[4] ID.—ACTS OF 1917 AND 1919—PURPOSE.—The purpose and intent of the act of the legislature of 1919 (Stats. 1919, p. 1203), as amended in 1921 (Stats. 1921, p. 459), and the act of 1917 (Stats. 1917, p. 1673), is to prohibit preventable waste of food fish, to discourage, and so far as practicable to prevent, the use thereof for any purpose other than human consumption and to affirmatively encourage the use thereof for this purpose.

[5] ID.—ACT OF 1919—CONSTRUCTION OF PROVISO.—The purpose of the proviso contained in section 5 of the act of 1919, as amended in 1921, the general provisions of which act purport to prohibit all persons from using fish fit for human consumption (except fish offal) for reduction purposes, said proviso purporting to except to a limited extent certain classes of persons from the operation of the general prohibition, upon the conditions therein specified, is to aid and encourage those who are engaged in catching and preparing fish for human consumption, and no reason exists for the giving of such aid and encouragement to those who are engaged in diverting food fish to other uses.

[6] ID.—CONSTRUCTION OF ACT—PERMISSION TO PACKERS.—The provisions of said act that the fish and game commission may, after a hearing, give packers permits which will enable them to engage for the taking of a specified quantity of fish in excess of their packing capacity, and upon occasions when such excess quantity is brought in, to use the same for reduction purposes, is to allow the packer a certain leeway or margin of safety to enable him so far as practicable to operate his packing plant regularly and at capacity, but there is no such reason for allowing this leeway to the operator of a reduction plant.

[7] ID.—REDUCTION PLANTS—PROHIBITION.—Said act does not prohibit the operation of a reduction plant, nor does it prohibit the use therein of fish not fit for human consumption, or of fish offal, but it prohibits only the use in such a plant of fish fit for human consumption.

[8] ID.—VALIDITY OF ACT—DISCRETION OF FISH AND GAME COMMISSION.—There is no merit in the contention that said act is invalid for the reason that it purports to vest in the fish and game commission arbitrary authority and unguided discretion in that it may allow one canner to take twenty-five per cent and another five per cent and another one per cent of excess fish, as the discretion of the commission is neither unguided nor uncontrolled, but its exercise is made dependent

8. See 11 R. C. L. 1042.

upon the findings of fact after a hearing that there is no market for the fish referred to in the application and that the taking or using of said fish in the reduction plant will not tend to impair or deplete said species of fish.

[9] CONSTITUTIONAL LAW — POWER OF LEGISLATURE — DELEGATION OF DISCRETION.—The legislature may, without violating any rule or principle of the constitution, confer upon an administrative board or officer a large measure of discretion, provided the exercise thereof is guided and controlled by rules prescribed therefor.

[10] ID.—REDUCTION PLANTS—APPLICATION OF ACT OF 1919 TO.— The statute of 1919 (Stats. 1919, p. 1203), as amended in 1921 (Stats. 1921, p. 459), is the statute which governs the respective rights and obligations of the operators of a reduction plant for the manufacture of fish-meal and fish-oil and fertilizer, and there is no conflict between that act and the act of 1917 (Stats. 1917, p. 1673), the former act governing a field of legislation not at all covered by the latter act.

[11] ID.—WHAT INCLUDED IN TERM "REDUCTION PLANT"—Considering the manifest policy of the statute of 1919 (Stats. 1919, p. 1203), which is the conservation of fish for the purpose of human consumption, the expression "reduction plant," as used therein, is at least sufficiently inclusive to apply to any plant engaged in the reduction of fish into other products which are not intended to be used, and are not in fact used, for human consumption.

[12] ID.—WHAT INCLUDED IN "WASTE"—From the terms and provisions of the act of 1919 (Stats. 1919, p. 1203) the term "waste" as there used was designed to include and apply to the use of fresh food fish for any purpose other than human consumption.

[13] ID.—USING FISH IN REDUCTION PLANT — VIOLATION OF STATUTE.—Engaging in fishing for fresh food fish with the direct purpose of delivering the catch to a reduction plant for the manufacture of fish-meal and fish-oil is a violation of the act of 1919 and constitutes preventable waste within the meaning thereof.

[14] ID.—TITLE TO FISH — RIGHTS OF STATE. — The title to and property in fish within the waters of the state are vested in the state of California and held by it in trust for the people of the state; and the legislature may dispose thereof as to it may seem best, subject only to constitutional limits against discrimination.

[15] ID.—PROTECTION OF FISH — POWER OF LEGISLATURE. — Within constitutional limitations, the legislature, for the purpose of

9.  See 6 R. C. L. 177; 5 Cal. Jur. 683.

conserving and protecting fish, may pass such laws as to it seem wise, and the question what measures are best adapted to that end are for its determination.

[16] ID.—PRIVATE OWNERSHIP OF FISH—LIMITATIONS.—Fresh food fish can become the subject of private ownership only in such qualified way, to such limited extent, and subject to such conditions and limitations as the state through its legislature may see fit to provide and impose.

[17] ID.—FISH TAKEN IN VIOLATION OF LAW—TITLE—NUISANCE.— If fresh food fish are taken in violation of law the fisherman who catches them acquires no title thereto, and even if they are taken lawfully a sale thereof for use in a reduction plant for the manufacture of fish-meal and fish-oil conveys no title thereto, and the title still remains in the state; and such use of fish is not only a violation of prohibitory provisions of a statute, but also a wrong committed against the property right of the state, and such an obstruction to the free use of property as to interfere with the comfortable enjoyment thereof by the people of the state, and as such constitutes a nuisance.

[18] ID.—UNLAWFUL TAKING OF FISH—DAMAGE—INJUNCTION— REMEDY AT LAW.—The unlawful taking of fresh food fish for use in a reduction plant for the manufacture of fish-meal and fish-oil causes a damage to the state which if continued would inflict an irreparable injury entitling the state to injunctive relief to prevent it, and the remedy at law is not adequate.

[19] ID.—ADEQUATE REMEDY AT LAW—QUESTION OF FACT.— Whether there is a plain, speedy, and adequate remedy at law in such a case is in the first instance a question for the trial court, and if the evidence is conflicting, or if opposing inferences may reasonably be drawn therefrom, it still remains a question of fact for the trial court, but the question is subject to review on appeal whether there is any substantial evidence to support a finding thereon.

[20] ID.—ACTION AT LAW—DAMAGES—POLICY OF STATE.—To relegate the state to an action for damages resulting from unlawful taking of fresh food fish would be to defeat *pro tanto* the legislative policy of conserving such fish of the state for human consumption.

[21] ID.—CRIMINAL PROSECUTION—INADEQUATE REMEDY.—Criminal prosecution for a violation of the penal provisions of the act of 1919 (Stats. 1919, p. 1203) affords no adequate remedy for

18. Right to enjoin act which is both nuisance and crime; notes, 13 Ann. Cas. 794; Ann. Cas. 1914A, 440; Ann. Cas. 1916C, 455; Ann. Cas. 1916D, 788. See, also, 14 R. C. L. 379; 14 Cal. Jur. 211.

the civil wrong resulting from the violation of said act, which consists .of the invasion of the state's property right.

[22] Id.—Injunction—Findings.—In an action for an injunction restraining defendant from causing or permitting preventable waste of fish fit for human consumption by using the same in a reduction plant for the conversion thereof into fish-meal and fish-oil, a finding that large quantities of the sardines which have been accepted and received by the defendant were unfit for human consumption is immaterial where it was proven by uncontradicted testimony and expressly admitted by defendant that the latter was also engaged in receiving and using in its reduction plant large quantities of fish which were fit for human consumption.

(1) 36 Cyc., p. 976, n. 27.    (2) 12 C. J., p. 791, n. 19, p. 794, n. 23, p. 891, n. 77, p. 1130, n. 27.    (3) 26 C. J., p. 627, n. 19 New. (4) 26 C. J., p. 627, n. 19 New.    (5) 26 C. J., p. 627, n. 19 New. (6) 26 C. J., p. 625, n. 6.    (7) 26 C. J., p. 627, n. 19 New.    (8) 12 C. J., p. 853, n. 2.    (9) 12 C. J., p. 844, n. 56.    (10) 26 C. J., p. 627, n. 19 New.    (11) 26 C. J., p. 627, n. 19 New.    (12) 26 C. J., p. 627, n. 19 New.    (13) 26 C. J., p. 627, n. 19 New.    (14) 26 C. J., p. 597, n. 53, p. 623, n. 92.    (15) 12 C. J., p. 887, n. 38; 26 C. J., p. 623, n. 92.    (16) 26 C. J., p. 598, n. 61 New.    (17) 26 C. J., p. 598, n. 61, p. 627, n. 19 New.    (18) 32 C. J., p. 271, n. 47. (19) 4 C. J., p. 900, n. 99, p. 902, n. 6.    (20) 32 C. J., p. 271, n. 48. (21) 32 C. J., p. 279, n. 55.    (22) 32 C. J., p. 366, n. 6.

APPEAL from a judgment of the Superior Court of Monterey County.    Fred A. Treat, Judge.    Reversed.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, Robert W. Harrison, Deputy Attorney-General, and B. D. Marx Greene, for Appellant.

Robert D. Duke and C. F. Lacey for Respondent.

MYERS, C. J.—This is an appeal by plaintiff from a judgment in favor of defendant in an action to procure an injunction restraining the defendant from causing or permitting preventable waste of fish fit for human consumption by using the same in a reduction plant for the conversion thereof into fish-meal and fish-oil. It is alleged in the complaint that the defendant is engaged in the business of operating a reduction plant for the manufacture of fish-

meal and fish-oil and fertilizer and that during the present seasonal run of sardines it has received, is receiving, and threatens in the future to receive from persons without written permission from the fish and game commission sardines fit for human consumption and is using the same for reduction purposes, thereby permitting and causing preventable deterioration and waste thereof; that defendant threatens to continue to so receive and reduce fish fit for human consumption at its reduction plant unless restrained therefrom, and will thereby cause preventable deterioration and waste of food fish caught within the waters of this state and great and irreparable loss and damage to the people of the state; that there is no plain, speedy and adequate remedy at law, and that the acts of defendant, if permitted to continue, will be such an obstruction to the free use of property as to interfere with the comfortable enjoyment thereof by the people of the state. The defendant in its answer admits that it is engaged in the business of manufacturing fish-meal and fish-oil, but denies practically all of the remaining allegations of the complaint. The issues thus framed were narrowed somewhat by the express admissions of counsel for defendant at the commencement of the trial as follows: ''The only issues that are raised by this answer concern the averment in the complaint that the defendant is engaged in operating a reduction plant. We admit that we are manufacturing fish meal and fish oil, but deny that we are operating or manufacturing fertilizer. We admit we have received fish [fit for human consumption] from persons who have no permit from the fish commission, and we intend to continue to do so. We deny we are causing preventable deterioration or waste of fish and we deny that our use of fish is depleting the supply of sardines and we also deny that there is no adequate remedy at law. We deny that formal averment in the complaint that there is great and irreparable injury due to these acts. Our claim is that fish meal and fish oil are fit for human consumption. It is not a deterioration or waste of fish as those terms are meant in the statute and it is not a reduction plant within the statute.'' The trial court found in favor of the defendant upon these issues. Appellant contends that the findings thus made are contrary to the evidence; that the judgment is against law in that it is not supported by the findings, and particularly

that the conclusions of law are in violation of the rules laid down in the recent case of *People* v. *Stafford Packing Co.*, 193 Cal. 719 [227 Pac. 485]. The respondent contends that the findings are in accordance with the evidence and that the judgment is sustained by the findings, but places its principal reliance upon two contentions which were neither discussed nor considered in the Stafford Packing Company case, *supra*, namely: first, that the statute upon which plaintiff relies is unconstitutional, and, second, that this statute, even if constitutional, is not applicable to the situation involved herein, which is governed by a different statute.

The statute upon which the appellant relies is "An act to conserve the fish supply in California by empowering the fish and game commission to regulate and control the handling of fish or other fishery products for the purpose of preventing deterioration or waste; . . . " (Stats. 1919, p. 1203.)

Section 4 thereof provides: "No person, firm or corporation engaged in the business of catching, buying, selling, canning, packing or preserving fish, shall suffer or permit, or cause preventable deterioration, or wilfully do any act that might cause deterioration or waste of any fish caught or taken within or without the waters of this state and brought into this state, and no person, firm or corporation engaged in the business of catching, buying, selling, canning, packing or preserving fish or other fishery products shall sell or offer for sale or delivery, or deliver any fish or other fishery products, to any reduction plant or divert fish or other fishery products for reduction purposes without first having written permission from the fish and game commission, and no reduction plant shall accept or receive any fish, other than fish offal, from any person, firm or corporation without such written permission."

Section 5 thereof, as amended (Stats. 1921, p. 459), provides: "No person, firm or corporation engaged in the business of taking or catching food fish or other fishery food products shall take or catch or kill more fish or other fishery products than the boat or boats owned or operated by said person, firm or corporation can handle and deliver to the fresh fish dealer in a condition fit for human consumption, or to a canner, packer or preserver of fish in a condition

fit to be canned or packed or preserved for human consumption . . . It shall be unlawful for any person, firm or corporation to buy or sell or receive or use any kind or species of fish fit for human consumption for reduction purposes except fish offal; provided, that any person, firm or corporation engaged in taking, catching or dealing in fresh fish or fishery products for human consumption, or any person, firm or corporation engaged in the business of canning, packing or preserving fish for human consumption, desiring to sell or deliver or use in a reduction plant any fish fit for human consumption shall file an application with the fish and game commission setting forth the kind or species and quantity of fish to be sold, delivered or used in a reduction plant. [Here follow procedural provisions for a hearing thereon.] If after hearing evidence upon said application it shall appear that there is no market for the fish referred to in said application and that the taking or using of said fish in a reduction plant will not tend to impair or deplete said species of fish an order may be made by the board of fish and game commissioners granting the privilege to take, catch or kill and deliver to or use in a reduction plant during a calendar month an amount of said fish not to exceed twenty-five per cent of the amount any such applicant, person, firm, or corporation can can or pack or preserve for human food during a calendar month. Said order shall not be granted for a period longer than a seasonal run of said kind or species of fish mentioned in said order."

It is respondent's contention that this act, and particularly section 5 thereof, is unconstitutional, for the reason that it excludes everyone except those who are engaged in taking, catching, dealing in, packing, or preserving fish or fish products for human consumption from the privilege of using any such fish in a reduction plant, and at the same time it expressly provides for the granting of such privilege to these favored classes. Respondent argues that there exists no natural, constitutional, or intrinsic basis for this classification and that the same is, therefore, arbitrary, unreasonable, and discriminatory and constitutes special legislation, violating the prohibition of both the state and federal constitutions (citing *Van Harlingen* v. *Doyle,* 134 Cal. 53 [54 L. R. A. 771, 66 Pac. 44] ; *Ex parte Sohncke,* 148 Cal. 267 [113 Am. St. Rep. 236, 7 Ann. Cas. 475,

2 L. R. A. (N. S.) 813, 82 Pac. 956]; *Conolly* v. *Union S. P. Co.*, 184 U. S. 563 [46 L. Ed. 679, 22 Sup. Ct. Rep. 431, see, also, Rose's U. S. Notes]; *Bailey* v. *People*, 190 Ill. 28 [83 Am. St. Rep. 116, 54 L. R. A. 838, 60 N. E. 98]; *Schaezlen* v. *Cabaniss*, 135 Cal. 466 [87 Am. St. Rep. 122, 56 L. R. A. 733, 67 Pac. 755]; *Hewitt* v. *Board*, 148 Cal. 594 [113 Am. St. Rep. 315, 3 L. R. A. (N. S.) 896, 84 Pac. 39]). It may be doubted that these objections, which apply only to the proviso contained in the statute would, if well founded, be of any avail to respondent herein. The general provisions of the act in question purport to prohibit all persons from using fish fit for human consumption (except fish offal) for deduction purposes.. The proviso purports to except to a limited extent certain classes of persons from the operation of the general prohibition, upon the conditions therein specified. It may be argued with much reason that if the exception thus attempted be invalid because of its arbitrary and discriminatory character the result thereof would be to annul the exception, leaving the general prohibitory provisions of the act unimpaired. This result would in no way improve respondent's position. [1] The general rule is that when a proviso in the nature of an exception to a general statute is invalid, the general provisions of the statute are not invalidated thereby, unless it clearly appears that the provisions of the exception are so intimately and inherently related to and connected with the general provisions to which it relates that the legislature would not have enacted the latter without the former (5 Cal. Jur., sec. 655 et seq., and cases cited). Counsel for respondent have advanced no reasons for the adoption of such a conclusion with respect to the statute here under consideration. However, we are not disposed to hold that the exception now under consideration is discriminatory or unreasonable. [2] When a legislative enactment is attacked upon this ground all presumptions and intendments are in favor of the reasonableness and fairness of the legislative action (5 Cal. Jur., sec. 628 et seq., and cases cited), and the decision of the legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary (Id., sec. 832 et seq., and cases cited).

[3]   The public policy of this state in its relation to the food fish within its waters has been clearly, consistently, and unmistakably manifested throughout the history of its fish and game legislation.   It aims at the protection and conservation of food fish for the benefit of the present and future generations of the people of the state and the devotion of such fish to the purposes of human consumption. In confirmation thereof we need only refer to the provisions of the act of 1919 and the amendment thereof in 1921, *supra,* and to the provisions of the act of 1917, relied upon by respondent herein (Stats. 1917, p. 1673).   [4]   It is plain that the purpose and intent of both of these acts is to prohibit preventable waste of food fish, to discourage, and so far as practicable to prevent, the use thereof for any purpose other than human consumption and to affirmatively encourage the use thereof for this purpose.   [5]   With this item of public policy in mind it is apparent that the purpose of the proviso which is here claimed to be unreasonable and discriminatory is to aid and encourage those who are engaged in catching and preparing fish for human consumption and that no reason exists for the giving of such aid and encouragement to those who are engaged in diverting food fish to other uses.   It is to the interest of the people of the state that the packing plants engaged in the packing and preparing fish for human consumption shall be operated efficiently and economically, so that the price of their product to the consumer thereof may be kept down.   A packing plant can be operated most efficiently and economically when it is enabled to operate steadily at a constant rate of output approaching its maximum capacity. But when the fishermen start out to make a catch no one can foretell with exactitude the size of the catch which they will take.   [6]   Therefore, in order to insure so far as practicable that the catch for each day shall approximate the capacity of the packing plant the act provides that the fish and game commission may, after a hearing, give the packer a permit which will enable him to engage for the taking of a specified quantity of fish in excess of his packing capacity, and upon occasions when such excess quantity is brought in to use the same for reduction purposes.   The purpose of this is to allow the packer a certain leeway or margin of safety to enable him so far as practicable to oper-

ate his packing plant regularly and at capacity. There is no reason for allowing to the operator of a reduction plant, who is not packing fish for human consumption, any margin or leeway whatsoever, because he is forbidden to take any fish fit for human consumption for use in his reduction plant. This presents to our minds a reasonable and natural basis for the distinction made in the act between the two classes of operators and it is not necessary to discuss the other reasons therefor which are suggested by counsel for appellant. There is no merit in the claim of respondent that the effect of this act is to prohibit the legitimate business of conducting a reduction plant by one who is not engaged in packing fish for human consumption. [7] The act does not prohibit the operation of a reduction plant, nor does it prohibit the use therein of fish not fit for human consumption or of fish offal. It prohibits only the use in such a plant of fish fit for human consumption. If the respondent is in fact engaged in a legitimate business it is not prohibited by this act from continuing the same. On the other hand, if respondent is engaged in the taking and use in its reduction plant of fish fit for human consumption, it is violating the law and is not engaged in a legitimate business. [8] There is no merit in the contention that the act is invalid for the reason that it purports to vest in the commission arbitrary authority and unguided discretion in that it may allow one canner to take twenty-five per cent and another five per cent and another one per cent of excess fish. The act confers discretion upon the commission, it is true, but such discretion is neither unguided nor uncontrolled. Its exercise is made dependent upon the findings of fact after a hearing "that there is no market for the fish referred to in said application and that the taking or using of said fish in a reduction plant will not tend to impair or deplete said species of fish." It is apparent that there may be varying circumstances of time, place, method of catching fish, location where they are to be found with relation to the location of the cannery, etc., which may legitimately justify the allowance of a larger leeway in one case than in another. [9] The legislature may, without violating any rule or principle of the constitution, confer upon an administrative board or officer a large measure of discretion, provided the exercise thereof is guided

and controlled by rules prescribed therefor (*Tarpey* v. *Mc-Clure*, 190 Cal. 593 [213 Pac. 983], and cases cited).

[10] Under its second point, *supra*, respondent contends that it is not governed or affected by the act of 1919, which we have been considering herein, but that it is acting pursuant to and by virtue of authority expressly granted to it by the act of 1917, *supra* (Stats. 1917, p. 1673). Section 5 of this act provides that the state market director is authorized to regulate and control the business of buying, selling, and otherwise disposing of fresh food fish, and that such fish may not be bought, sold, or disposed of except in accordance with the provisions of the act. Section 7 thereof makes it unlawful to destroy food fish in excess of fifty pounds per day, or to divert any food fish to any use other than human consumption without the written consent of the market director. This is followed by a proviso that "nothing in this section shall be construed to apply . . . to any individual market fisherman who is unable to sell for human consumption fish he has caught and who within forty-eight hours after the destruction or diversion of said fish shall report to the state market director the number of pounds and varieties of fish and how disposed of . . . " Respondent argues that this proviso is in effect an express grant to market fishermen, under the circumstances there mentioned, of the right and authority to destroy or divert the fish caught by them, and that, incidentally and by necessary implication, it is a grant to respondent of the right to use such fish in its reduction plant; that the later act of 1919 does not expressly repeal this act, and that under well-established rules of statutory construction it should not be construed as affecting such repeal by implication. This view of the law was evidently adopted by the trial court, as it made a finding that all of the sardines accepted and received by the defendant were caught by individual market fishermen who were unable to sell them for human consumption. We are not in accord with this view. There is no conflict between the two acts as to the matter here under consideration. The 1919 act covers a field of legislation not all covered by the 1917 act. The earlier act contains certain prohibitions against the destruction or diversion of food fish which are by its terms expressly made inapplicable to the individual market fisherman who is unable to sell

for human consumption fish he has caught. The later act contains other and broader prohibitions which apply to all persons, firms, or corporations engaged in the business of catching fish. This of necessity includes the individual market fisherman who was excepted from the operation of the earlier act. There is no merit in the claim that the earlier act grants to or confers upon such market fisherman a substantive right to destroy or divert fish caught by him. It does no more than this: It omits to prohibit him from so doing. The earlier act expressly negatives the contention that it is applicable to the situation here in question by the proviso that "nothing in this section shall be construed to apply . . . " thereto. In short, the later statute covers a field not covered by the earlier and there is no conflict in this respect between the two. The diversion of fish by the individual market fisherman who is unable to sell his catch is not prohibited by the earlier statute, but it is prohibited by the later one. We conclude, therefore, that the statute of 1919, as amended in 1921, is the statute which governs the respective rights and obligations of the parties hereto and that it is not invalid by reason of any of the matters which have been suggested herein. This brings us to a consideration of the points upon which appellant relies for a reversal of the judgment.

In finding 1 and 2 the court found that "it is not true that the defendant is or ever was engaged in the business of operating a reduction plant for the manufacture of fish-meal, fish oil and fertilizer . . . or is now accepting or receiving sardines at any reduction plant, or is, or ever was, using said fish for reduction purposes." As we have noted, the defendant expressly admitted at the commencement of the trial that it was engaged in the business of operating a plant for the reduction of fish into fish-oil and fish-meal. It contended, however, that this does not constitute a reduction plant as that expression is used in the statute because of the fact that the resulting products—fish-oil and fish-meal—were not sold by the defendant to be used, and were not used, as fertilizer, but were sold to be used, and were, in fact, used, as poultry food. In short, it is defendant's contention that a plant which is engaged in the reduction of fish to fish-oil and fish-meal is a reduction plant only when those products are used as fertilizer and is not

a reduction plant when the products are used as poultry food. The trial court evidently concurred with and adopted this contention, as it is the only theory upon which these findings are explicable. Respondent asserts that "to 'the man in the street' the term *reduction plant* signifies a place where dead animals, garbage, offal and waste material are converted into *fertilizer* of the soil . . . " We are not aware of this fact, if it be a fact. We find no authority, either among the lexicographers or the law writers or the decided cases, for so narrow and restricted a definition. The verb "reduce" is defined by Webster as follows: "To bring to a certain state or condition by grinding, pounding, kneading, rubbing, etc.; as, to *reduce* a substance to powder, or to a pasty mass; to reduce fruit, wood or paper rags to pulp." The Standard Dictionary gives a substantially similar definition. It is true, as suggested by respondent, that this word has also other and widely variant meanings, but no other approved definition thereof has been suggested as being in anywise appropriate to the context of the statute here in question. This court has defined the word "reduce," when applied to the mining industry, as meaning "to bring to a specified form or condition, as, to reduce a rock to powder, or, to deprive an ore of nonmetallic constituents," and has held that the word "reduction," used in this connection, means the separation of metals from their ores (*In re Martin,* 157 Cal. 60 [106 Pac. 239]). In that case it was also held that the phrase "smelters and other institutions for the reduction or refining of ores or metals" when contained in a penal statute is sufficiently comprehensive to include a quartz-mill in which the operation consisted solely of crushing ore and then washing the same. The process used by defendant herein, briefly described, consists in cooking the fish, separating and removing therefrom the major portion of the oil and water content thereof, and grinding the residue to a meal or powder known as fish-meal. Precisely the same process is used in those plants which are operated for the reduction of fish for use as fertilizer, except that in the latter case the meal may be ground to a finer powder than is desirable for poultry food, and except, further, that when the product is to be used as fertilizer fish may be used in such an advanced stage of decomposition as would render the product unfit for poultry

195 Cal.—36

food.  [11]  Having in mind the manifest policy of the act, which is the conservation of fish for the purpose of human consumption, we have no doubt that the expression "reduction plant," as used therein, is at least sufficiently inclusive to apply to any plant engaged in the reduction of fish into other products which are not intended to be used, and are not in fact used, for human consumption. In this view of the law there is no basis in the evidence for the quoted findings numbered 1 and 2, and the same conclusion applies to the first portion of finding number 4, to the effect that "it is not true that the defendant threatens to accept or receive sardines at any reduction plant, or threatens to use such fish for reduction purposes . . . "

Finding 3 and a portion of finding 4 are to the effect that it is not true that the defendant has, or is now permitting or causing, or threatening to permit or cause preventable or other deterioration or waste of fish caught within the waters of this state.  [12]  It is clear from the terms and provisions of the statute that the term "waste" as there used was designed to include and to apply to the use of fresh food fish for any purpose other than human consumption.  [13]  There was uncontradicted testimony at the trial from one of defendant's witnesses that two fishermen, named by him, were engaged in fishing with the direct purpose of delivering their catch to the defendant for use in its reduction plant.  There was other testimony, uncontradicted, as to the number of tons of fresh fish which had been delivered by these two fishermen to the defendant upon specified dates shortly prior to the trial.  This was not only a violation of the prohibitory provisions of the statute, but we think that it constituted preventable waste within the meaning thereof.

The court further found that it is not true that any use made of such fish by the defendant will cause any loss or damage to the people of the state of California or will be such an obstruction to the free use of property as to interfere with the comfortable enjoyment of property by the people of the state of California, or that the defendant threatens to continue to commit any wrongful act.  These findings are apparently predicated upon the conclusion of the learned trial judge that the defendant in using fresh food fish in its reduction plant was exercising a right granted to it by the

statute of 1917, *supra,* and, therefore, committed no wrong. Of course, if the defendant were in fact acting within its legal rights and committing no wrong, the plaintiff could not in contemplation of law be damaged thereby. But, as we have seen, the statute of 1917 confers no such right. [14] The title to and property in the fish within the waters of the state are vested in the state of California and held by it in trust for the people of the state (*Geer* v. *Connecticut,* 161 U. S. 519, 529 [40 L. Ed. 793, 16 Sup. Ct. Rep. 600, see, also, Rose's U. S. Notes]; *People* v. *Truckee Lumber Co.,* 116 Cal. 397 [58 Am. St. Rep. 183, 39 L. R. A. 581, 48 Pac. 374]; *In re Phoedovius,* 177 Cal. 238 [170 Pac. 412]; *People* v. *Stafford Packing Co., supra*). The legislature may dispose thereof as to it may seem best, only subject to constitutional limitations against discrimination. [15] Within those limitations the legislature, for the purpose of conserving and protecting fish, may pass such laws as to it seem wise, and the question what measures are best adapted to that end are for its determination (*Ex parte Kenneke,* 136 Cal. 527 [89 Am. St. Rep. 177, 69 Pac. 261]; *In re Phoedovius, supra.*) [16] Such fish can become the subject of private ownership only in such qualified way, to such limited extent, and subject to such conditions and limitations as the state through its legislature may see fit to provide and impose (*In re Phoedovius, supra; Paladini* v. *Superior Court,* 178 Cal. 369 [173 Pac. 588]). "It is, therefore, evident that what the people of the state own they can alienate on such terms as they choose to impose, and that this power of regulation continues so long as such fish or game are the subject of trade or transfer." (*Paladini* v. *Superior Court, supra.*) In section 4 of the act of 1917, *supra* (Stats. 1917, p. 1674), the legislature imposed the following limitations: "No such fish shall be caught, taken or killed in any manner or at any time except that the person so catching, taking or killing, or having the same in his possession, irrespective of the manner in which they were obtained, shall by such act or possession thereby consent that the title to such fish shall be and remain in the State of California for the purpose of regulating and controlling the use and disposition of same after such catching, taking or killing, and except that the title to such fish legally taken shall vest in the person so taking or possessing them,

subject to the restrictions and provisions of law.'' [17] It follows that if the fish were taken in violation of law the fisherman who caught them acquired no title thereto, and even if they were taken lawfully a sale thereof to defendant for use in its reduction plant would convey no title thereto, and the title would still remain in the state. The use of fish which was admittedly made by the defendant herein was not merely a violation of prohibitory provisions of a statute, but was also a wrong committed against the property right of the plaintiff. It was such an obstruction to the free use of property as to interfere with the comfortable enjoyment thereof by the people of the state of California and as such constituted a nuisance (*People* v. *Truckee Lumber Co., supra; People* v. *Stafford Packing Co., supra*). Under these circumstances it cannot be said that such use of fish by the defendant did not or will not cause any loss or damage to the plaintiff and this finding is, therefore, contrary to the evidence.

[18] This brings us to the question whether or not the damage and injury so inflicted upon the plaintiff and which the defendant admittedly threatens to continue to so inflict is or will be irreparable in such sense as to entitle the plaintiff to injunctive relief. This question is so intimately bound up with the question of the availability of an adequate remedy at law that the two may well be considered together. The court found: ''It is not true that the plaintiff has no plain, speedy and adequate remedy at law . . . '' [19] As we pointed out in the Stafford case, *supra*, this is in the first instance a question for the trial court and if the evidence is conflicting, or if opposing inferences may reasonably be drawn therefrom, it still remains a question of fact for the trial court. There still remains for review upon appeal, however, the question whether there is any substantial evidence to support the finding thereon. The court also found: ''That the supply of sardines in the Bay of Monterey, and generally along the Pacific coast is practically inexhaustible, and that the quantity heretofore taken from the Bay of Monterey during the seasonal run of sardines has not appreciably depleted said species of fish, but on the contrary said species is upon the increase.'' Appellant vigorously assails this finding as unsupported by, and contrary to, the evidence. But we are inclined to disagree with this conten-

tion.   There was evidence that the supply of sardines in
the vicinity of the bay of Monterey had not been *appreciably*
depleted up to the time of trial.   There was also evidence
to the effect that the size of the catch in this vicinity has
increased since 1919.   There was no evidence that the supply
is practically inexhaustible · or that the species is on the
increase, except as these facts might be inferred from the
testimony above adverted to.   There was also testimony, not
substantially contradicted, to the effect that if unrestricted
fishing of sardines in the coastal waters of this state for the
reduction thereof into fertilizer and poultry food is per-
mitted, the supply will not merely be depleted but will be
practically exhausted as a result thereof.   But as this was
in the nature of opinion evidence and as the facts upon
which the opinion was predicated are nowise conclusive,
we are not prepared to say that the trial court was bound
to accept this testimony at its face value.   We conclude
that this finding is not unsupported by the evidence,
but we do not regard it as determinative of the pres-
ent question.   The only other remedy suggested by respond-
ent as available to appellant herein is an action at law for
damages.   It is apparent that the amount of damages which
would compensate plaintiff for the destruction of its fish
and the diversion thereof to uses other than human con-
sumption would be extremely difficult, if not impossible, of
ascertainment.   This is particularly true in the light of the
circumstance that the state owns the fish, not in a private or
proprietary capacity, but in its sovereign capacity and as a
trustee for the people of the state.   [20]   It is further ap-
parent that to relegate the state to an action for damages
would be to defeat *pro tanto* the legislative policy of con-
serving the fish of the state for human consumption.   As
was suggested in *Hurlbert* v. *California etc. Cement Co.,* 161
Cal. 239 [38 L. R. A. (N. S.) 436, 118 Pac. 928], to permit
the defendant to continue the taking and destruction of the
property of plaintiff, even though the defendant be re-
quired to pay the full value thereof as damages, would
be in effect to allow and to legalize the unauthorized seizure
and taking of property for a use other than a public use.
The remedy which was suggested in the Stafford case, *supra,*
as an adequate remedy at law, to wit, the revocation of
defendant's permit, is inapplicable herein because this de-

fendant has no permit which is subject to revocation. It is operating without a permit and in violation of the law. [21] The circumstance that it may be prosecuted criminally for a violation of the penal provisions of the statute affords no adequate remedy for the civil wrong, which consists of an invasion of plaintiff's property right (*People* v. *Truckee Lumber Co., supra; People* v. *Stafford Packing Co., supra*). We conclude that there is no adequate remedy at law available to the plaintiff herein and this conclusion renders it unnecessary to consider plaintiff's contention that under subdivision 1 of section 526 of the Code of Civil Procedure it is not required to show great or irreparable injury in order to entitle itself to injunctive relief. [22] The finding of the trial court "That large quantities of the sardines which have been accepted and received by the defendant were unfit for human consumption . . . " is immaterial in the light of the fact that it was proven by uncontradicted testimony and expressly admitted by defendant that it was also engaged in receiving and using in its reduction plant large quantities of fish which were fit for human consumption.

For the reasons above indicated, the judgment is reversed.

Shenk, J., Seawell, J., Richards, J., Waste, J., Lennon, J., and Lawlor, J., concurred.