[Crim. No. 20456. Second Dist., Div. Five. Nov. 2, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
JOHN ZANKICH, Defendant and Respondent.

## Counsel

Evelle J. Younger, Attorney General, Jeffrey C. Freedman, Deputy Attorney General, Woodruff J. Deem, District Attorney, and Steven Z. Perren, Deputy District Attorney, for Plaintiff and Appellant.

Omer L. Raines for Defendant and Respondent.

## Opinion

**REPPY, J.** — After a certification by the Appellate Department of the Superior Court for Ventura County under rule 63(a), California Rules of Court, we ordered this appeal from the Municipal Court of Ventura County transferred under rule 62(a). The superior court stated as the important point making transfer appropriate "whether sections 8180 et seq. of the Fish and Game Code, and specifically section 8181 [by their terms], declare the waters of the State . . . open to the taking of anchovies for any purpose or whether the taking of anchovies for reduction purposes can be regulated by the Fish and Game Commission as it has purported to do in title 14, section 147(a)-6-B of the California Administrative Code."

It appears that the regulation of fishing for reduction purposes[1] was first instituted in Statutes 1919, chapter 551, section 5, page 1204, followed by Statutes 1921, chapter 340, section 1, page 459. The Fish and Game Code of 1933 contained section 1068 on this subject. In 1957, as part of an overall revision of the Fish and Game Code,[2] without substantive change, this section became sections 8075 through 8080. Section 8075 reads as follows: "The commission may grant a permit, subject to such regulations as it may prescribe, to take and use fish by a reduction . . . process."

Section 8076 reads as follows: "No reduction of fish shall be permitted which may tend to deplete the species, or result in waste or deterioration of fish."

---

[1]Reduction consists of the process of cooking the fish, separating and removing therefrom the major portion of the oil and water content thereof and grinding the residue into a meal for poultry food or a powder for fertilizer. (See *People* v. *Monterey Fish Products Co.*, 195 Cal. 548, 561 [234 P. 398, 38 A.L.R. 1186]; Fish & G. Code, § 7700.)

[2]All references to section numbers are to the Fish and Game Code unless otherwise specified.

Section 7700 et seq. also relate to the regulation of fish for reduction purposes. They are derived from sections 1060 through 1068 of the 1933 Code. Section 7704, which has the title "Waste," reads in part as follows: "Except as allowed by this code, it is unlawful to use any fish . . . , except fish offal, . . . by a reduction process."

Section 7701 reads in part as follows: "The commission may regulate . . . commercial fishermen, . . . insofar as necessary . . . to prevent . . . waste of fish."

Section 7708 provides in part as follows: "The commission may make and enforce such regulations as may be necessary or convenient for carrying out any power . . . conferred under this article." (Art. 2 [general provisions] of part 3 [commercial fishing] containing §§ 7700 through 7708.)[3]

In 1953 section 747 of the Fish and Game Code was made into law by the state Legislature. (Stats. 1953, ch. 1065, § 1, p. 2548.) In 1957, without substantive change, this section became sections 8180 through 8189. (Stats. 1957, ch. 456, pp. 1437-1438.) Section 8180 reads as follows: "In any district or part of a district lying south of a line drawn east and west through Point Mugu, anchovies may be taken in any quantity for bait or for human consumption in a fresh state, or, by contract with the department, for hatchery food, not to exceed 500 tons per year."

Section 8181 reads as follows: "Anchovies taken south of that line in waters not less than three nautical miles from the nearest point of land on the mainland shore, and anchovies taken north of that line in any waters, may be possessed, transported, sold, or otherwise dealt with in any district or part of district south of that line."

Prior to the time of this enactment, under the authority granted by old section 1068, the commission had promulgated certain rules, with the nature of which it is to be presumed the Legislature was familiar. They dealt mostly with sardines, a variety of fish obviously then catching the attention of officials concerned with a management of the state's fish resources consonant with the best interests of the people. Some regulations

---

[3]The power of the Legislature, including that of delegation to the commission, is provided for in article IV, section 20 of the California Constitution (previously art. IV, § 25½) reading in part as follows: "(a) The Legislature may provide for division of the State into fish and game districts and may protect fish and game in districts or parts of districts. ¶ (b) . . . The Legislature may delegate to the commission such powers relating to the protection and propagation of fish and game as the Legislature sees fit. . . ."

involved the use of sardines for canning and reduction purposes. Our only ready source of information is the registers under title 14 in the Administrative Code, a memorial of regulations which was commenced in 1945. Regulations of interest are summarized in the indicated footnote.[4]

In 1965 a regulation was promulgated by the commission pertaining to the taking of anchovies for reduction purposes which was much like that now under consideration. In August 1968 the regulation was put in the form that it was in when Zankich became involved with the authorities. (Cal. Admin. Code, tit. 14, Register 68, No. 29.) It was designated as section 147(a)-6-B of title 14 of the Administrative Code and reads in part as follows:

---

[4]The regulations were first memorialized in numbered General Orders. In November 1937 General Order No. 11 allowed the use of spoiled sardines intended for canning for reduction purposes and provided a method for documenting the diversion of sardines from canning or reduction to other uses. (§ 141.) In January 1940 General Order No. 12, in order to prevent waste, prohibited the taking of more sardines for canning and reduction than there were bona fide orders for and cautioned fishermen to avoid netting more fish than they intended to take into their boats. (§ 142.)

In March 1945, Regulation section 154, which then set out a policy relating to reduction permits and made provision for tonnage allotments to be recommended by the Bureau of Marine fisheries, was amended to set out a policy of using more sardines for human consumption in the war emergency and allowed no new permits unless plant construction had started before December 31, 1944.

A regulation in Register 3 (May 1946, § 155, p. 30.3), regulated permits for the 1946-1947 season for which the tonnage had been set at 395,000.

A regulation in Register 8 (July 1947, § 155, p. 30.4) related to permits to take sardines for reduction during the 1947-1948 season, and subsequent seasons, tonnage to be announced by the commission on or before May 15. Permits beyond those for the prior season were not to be issued unless they would promote the economic utilization of fish.

A regulation found in Register 10, No. 5 (December 1947, § 144) set a size limit for Pacific and Jack mackerel and sardines.

A regulation found in Register 12, No. 7 (May 1948, § 156, p. 30.6), based on findings required by section 1068, set a reduction tonnage of 100,000 for the 1948-1949 season.

A regulation found in Register 16, No. 5 (June 1949, § 155) advised that the 1949-1950 tonnage of sardines for reduction would be announced by the commission which it could increase or decrease during the course of the season. New plants had to promote the economic utilization of fish. The next month the tonnage was set at 75,000 (Register 17, No. 3).

A regulation found in Register 19, No. 4 (March 1950, § 156) approved no advance number of permits. For any to issue, the commission had to be satisfied that the economic utilization of fish would be promoted and that no over-expansion of reduction plants would be caused.

By a regulation found in Register 24, No. 2 (April 1951, § 156) the commission set 150,000 as the tonnage for reduction for the 1951-1952 season.

By a regulation found in Register 28, No. 5 (May 1952, § 156) the commission allowed 100,000 tons for reduction for the 1952-1953 season.

"147. Granting and Issuance of Permits to Take and Use Anchovies by a Reduction Process.

". . . . . . . . . . . . . . . . . . . . . . .

"The following shall constitute the regulations under which permits may be issued for the take and use of anchovies for reduction:

"(a) Permits to Take Anchovies
". . . . . . . . . . . . . . . . . . . . . .

"(6) Permit Areas
". . . . . . . . . . . . . . . . . . . . .

"(b) Southern Permit Area. Subject to the zoning limitations noted below, the total tonnage for this area shall be 65,000 tons per season. The area shall include the waters of the Pacific Ocean between the United States-Mexico International Boundary and a line extending due west (true) from Point Conception. Anchovies taken under the provisions of these regulations may be taken in all waters of southern permit area described above, with the following exceptions: Within three miles of the mainland shore south of Point Conception and in all districts or portions of districts where and at such times as the use of round-haul nets is prohibited."

There are then some subparagraphs setting out certain geographically described zones and their part of the tonnage limitation. For instance, in zone 1 (generally Point Dume south to Catalina Island thence to Dana Point) the tonnage was set at 25,000; in zone 2 (generally, from Dana Point at an angle 12 nautical miles from the mainland shore and thence southeasterly to the United States-Mexico International Boundary and then back to the mainland) the tonnage was set at zero, and in zone 3 (all waters in southern area not in zones 1 and 2) it was set at 40,000 tons.[5] Subparagraph (A) of paragraph 6 deals with the northern permit area which runs from Point Conception north to the California-Oregon border, and the tonnage is set at 10,000 per season. Subparagraph (A) further provides that anchovies may be taken in all waters of the northern permit area with certain specified exceptions within certain numbered districts

---

[5]In October 1970 the zone concept was discarded. A 100,000 ton limit was set for the southern area, with anchovies being takable for reduction purpose in all' waters with certain specified exceptions. (Cal. Admin. Code, tit. 14, Register 70, No. 40.)

such as Bodega and Tomales Bays and within three miles of the shore of an area particularly described.[6]

The facts concerning the apprehension and charging of Zankich were set forth in a settled statement on appeal as follows:

"On . . . October 21, 1969, . . . defendant, a commercial fisherman [with permit[7]] took anchovies for reduction purposes within three miles of the mainland shore of the County of Ventura, north of Point Mugu and south of Point Conception. . . ."

■ It is somewhat difficult to discern what the intent of the Legislature was in passing sections 8180 and 8181, but at least we are satisfied that it was not to impliedly emasculate the delegation it had made to the commission under sections 8075, 7701 and 7708 of the power to regulate the taking of anchovies for reduction, by indirectly providing by a statute that south of Point Mugu to Mexico within three miles of the shore no anchovies could be taken for reduction purposes but that outside the three-mile limit and north of Point Mugu to Oregon anchovies could be taken for reduction purposes without any limitations whatsoever.

As indicated by sections 7704 and 7707, which in effect, provide that the use of fish in violation of section 8075 et seq., or in violation of any regulation of the commission constitutes a nuisance, and by certain language in *Bayside Fish Flour Company* v. *Gentry*, 297 U.S. 422, 428 [80 L.Ed. 772, 776, 56 S.Ct. 513], it is known that the use of fish for reduction purposes is not favored, and that the purpose of the legislation is to conserve for human food the fish found in the waters of the state. ■ As to the latter and to the same effect see *People* v. *Monterey Fish Products Co.,* *supra,* 195 Cal. 548, 557, stating that the public policy of the state "aims at the protection and conservation of food fish for the benefit of the present and future generations of the people of the state and the devotion of such fish to the purposes of human consumption." We also see that the Legislature with the aid of the commission had and has established a comprehen-

---

[6]We note that paragraph 7 by way of further subparagraphs (A) (B) and (C) provides dates for the opening and closing of seasons for the taking of anchovies for reduction purposes, including dates for closing in the south zone if allotments were reached. It would seem that Zankich's desired construction of section 8181 would prevent the allotment system in waters outside the three-mile limit, south of Point Mugu (the intervening boundary of the legislation) and in all waters north from there to Point Conception (the intervening boundary of the regulations).

[7]The permit issued to Zankich obviously was conditioned by the regulations set out in section 147(a)-6-B of the Administrative Code. Zankich's contention, therefore, has to be, in effect, that the permit really was free of such condition because the regulation was invalid as in conflict with section 8181 of the Fish and Game Code.

sive plan for the regulation and control of fishing for reduction purposes. Certainly this type of regulation and control was envisioned at the time of the enactment of sections 8180 and 8181, and they were passed against the backdrop of past practical operation through the medium of regulations entered from time to time in various registers of the Administrative Code. There appear to be two interpretations reachable from the language of section 8180. ■ We are not, of course, to speculate that the Legislature meant something other than what it said. (*Woodmansee* v. *Lowery*, 167 Cal.App.2d 645, 652 [334 P.2d 991]; *Bakersfield etc. Company* v. *McAlpine etc. Company*, 26 Cal.App.2d 444, 448-449 [79 P.2d 410].)

One interpretation for section 8180 would be that it limits what the Fish and Game Commission could regulate as to the taking of anchovies for human food, bait, and hatchery food within the three-mile limit south of Point Mugu (i.e., commercial fishermen could take fish for human food and bait in unlimited quantities and for hatchery food in the amount specified, and there could be no curtailment of these allowances by commission regulations) with all other areas being left to regulation and control by the commission. In 22 Ops.Cal.Atty.Gen. 96, it is noted that originally the wording of the first portion of the proposed enactment was that in the area, "lying south of Point Arguello, anchovies could be taken or possessed *only* for bait or for human consumption" (italics added); that after an amendment was added allowing the use for hatchery food up to 500 tons and a second amendment removing the words "or possessed" and setting up the wording of what became section 8181 was put in, a final amendment was made striking out the word "only" and adding in lieu thereof the words "in any quantity." This may have been done simply to make clear the distinction between taking for bait or human consumption and taking for hatchery food, but, in another sense, it very definitely changed the meaning of the section which originally seemed to indicate, by saying that anchovies could be taken only for food for human consumption, bait, and hatchery food, a prohibition against taking for any other purpose. This might have lent a little more credence to the thought that unlimited taking was contemplated in the other areas. Removing the word "only" and inserting the words "in any quantity" would suggest a revised intention to allow controls by commission regulation as to other purposes rather than a complete prohibition by statute.[8]

---

[8]There was no other current legislative history which aided the task of interpretation of sections 8180 and 8181. Later interim committee reports lent a little assistance.

The 1959 Interim Committee refers to the tonnage limit which the Code put in effect from April 1955 through March 1957 (old § 748 [effective May 1955]; see vol. 27 Assembly Interim Com. Report No. 7 [1953-1955] p. 18.), enacted with approval of the commercial fishing industry absent sufficient information to indicate the effect of a bag limit on anchovy population. It also alludes to a department

The alternative interpretation would be that commercial fishermen could only take anchovies for human food, bait and hatchery food within the three-mile limit south of Point Mugu, as specified, with an implied prohibition as to the taking of anchovies for any other purposes, including reduction, in this area.[9] However, in light of the public policy and plan of control above mentioned, even this interpretation would provide impliedly that all other areas were left to control and regulation by the Fish and Game Commission. Either interpretation appears reasonable. ■ It seems provident to authenticate the one which our analysis of 22 Ops.Cal.Atty. Gen. 96 suggests was that of the Attorney General. Under this construction, section 8180, insofar as it relates to the control of the taking by commercial fishermen of anchovies for reduction purposes, means that such taking within the three-mile limit between Point Mugu and the Mexican border is controlled by implied absolute prohibition arising from section 8180 itself and that such taking outside said three-mile limit in that stretch of waters and in all waters north of Point Mugu to the Oregon border is controllable by commission regulations and was so controlled at the time of Zankich's activity by the regulations set out in Administrative Code, title 14, section 147(a)-6-subdivision A as to waters north of Point Conception and subdivision B as to waters south thereof.

Section 8181 seems to be limited to the matter of bringing fish taken outside the three-mile area south of Point Mugu into that area: for example, bringing fish taken for reduction purposes, if such taking were not prohibited by regulation, from outside the three-mile limit into the three-mile limit area south of Point Mugu on the way to a reduction plant adjacent thereto, even though the taking for reduction purposes in that area were totally prohibited; or bringing fish taken for hatchery food outside the three-mile area into it, even though this would bring what was taken within that area above the 500 tons.[10]

---

biological concept that there be flexible bag limits with the determining factor being aerial and ground spotting surveys of schools and the department making the recommendations.

"In essence, then, the committee recommends renewal of Sections 8183-8187 [provisions re quota of and season for anchovies for canning, since repealed] of the Fish and Game Code, the bag limit figure to be recommended by the department."

Thus, the committee discussion seems keyed to an existing statutory plan which includes considerable regulation by the department (which would be through regulations promulgated by the commission).

[9] An affirmative specification as to one item may imply a negative specification as to another. (Martello v. Superior Court, 202 Cal. 400, 405 [211 P. 20], citing 1 Sutherland on Statutory Construction (2d ed.) § 249.)

[10] An example of controls of passage of fish between districts is found in In re Makings, 200 Cal. 474, 476-477 [253 P. 918]. A section of the Penal Code forbade transporting crab from certain designated Fish and Game districts to other parts of the state. The defendant conceded the legality of a prohibition against transporting

Either of the interpretations above specified keeps sections 8075 through 8080 and sections 8180 through 8189 compatible. ■ When two provisions of the code appear to conflict, reconciliation between the sections should be sought so as to give effect to both. (2 Sutherland on Statutory Construction (3d ed. 1943), § 3711, pp. 256-257.) Further, this allows operation of the presumption that the commission acted reasonably to formulate regulations in conformity with all statutory law. (*Bayside Fish Flour Co.* v. *Zellerbach,* 124 Cal.App. 564, 567 [12 P.2d 961].) We do not feel that the language in 22 Ops.Cal.Atty.Gen. 96, rendered in 1953, shortly after the passage of section 747, the forerunner of sections 8180 and 8181, to the effect that "anchovies netted south of Point Mugu more than three miles from shore and netted any place north of Point Mugu may be . . . dealt with in the southern area[s,] . . . means that the anchovies may be dealt with, . . . in any manner permitted by law . . . [which] includes reduction of anchovies in the round provided a permit is first had and obtained . . . ." (Pp. 98-99) expresses a viewpoint contrary to that set out by us; but, if it does, we are constrained to say that the viewpoint was improvidently espoused. Certainly the last sentence of the Attorney General is supportive of the compatability of the two sets of Code sections: "But section 747 [forerunner of sections 8180 and 8181] should not be construed to repeal by implication section 1068 [forerunner of section 8075, et seq.], since it is well recognized that such repeals are not favored (cf. 22 Cal.Jur., 709, 710, § 93)." (22 Ops.Cal.Atty.Gen. 96, 99.)

To construe sections 8180 and 8181, as Zankich would have it, so as to invalidate the commission's regulations would be to render section 8075 et seq., inapplicable to anchovies taken in any waters of the state north of Point Mugu, both in the southern and northern sectors set up in the regulations.

■ Zankich appears to argue at one point that the commission's regulations, in effect, formulate a new fish and game district, a thing the commission is not empowered to do. There is no merit to this suggestion. The regulations, of course, treat only with anchovies and with the taking of them for reduction purposes. The commission simply made regulations which applied in parts of two districts.[11] The Constitution itself appears to author-

---

from a single district to any other but challenged the right of the Legislature to group some districts so that transportation could be made from one district in the group to another district in the group, but not to areas outside the districts comprising the group. The argument was considered to be without merit.

[11]Section 11026 creates district 18 which is an area extending seaward from Yankee Point in Monterey County south to the Santa Barbara-Ventura county line;

ize this. (See wording in fn. 3, *supra.*) Sections 8180 and 8181, to an extent, do the same thing.

■ Zankich further argues that the power to regulate the taking of anchovies for reduction should not include the right to completely close an area; that the regulation can only be some reasonable curtailment above that. We find no merit in this contention. Complete curtailment could be reasonable under certain conditions. The trial court was not called upon to deal with this aspect.

■ Finally, Zankich suggests that section 200 et seq., apply and do not permit the regulations in question. However, the application of these code sections is limited to fishing for other than commercial purposes.

The order of the Ventura County municipal court dismissing the criminal complaint against Zankich is reversed, and the matter is remanded to that court for further proceedings in the criminal case consistent with our opinion.

Stephens, Acting P. J., and Aiso, J., concurred.

A petition for a rehearing was denied November 18, 1971.

---

section 11027 creates district 19 which comprises an area seaward from the Santa Barbara-Ventura county line to Mexico.