[Civ. No. 38413. First Dist., Div. One. Dec. 14, 1976.]

In re MICHELE C., a Minor.
STATE DEPARTMENT OF HEALTH, Petitioner and Respondent, v.
FRANK WESLEY CLAY, Objector and Appellant.

**COUNSEL**

Leslie R. Perry, under appointment by the Court of Appeal, and McCarthy & Perry for Objector and Appellant.

James P. Botz, County Counsel, and Richard W. Ergo, Deputy County Counsel, for Petitioner and Respondent.

## OPINION

ELKINGTON, J.—The California State Department of Health petitioned the superior court to have one Michele C., a minor, declared free from the custody and control of her parents following her father's conviction of the murder, second degree, of her half sister and her mother's conviction of being an accessory (Pen. Code, § 32) to the murder. Apparently by agreement, the minor was adjudged free from the custody and control of her mother, and the action continued against her father. Following an appropriate trial the superior court adjudged that: "Michele . . . a minor person, is hereby declared and adjudged to be free from the parental custody and control of her father, . . ."

The father (hereafter "appellant") alone has appealed.

Uncontroverted evidence established the facts which we shall now relate.

The mother of Michele had two children of a prior marriage, Kenneth, aged five, and Kelly, aged two and a half. Following her marriage to appellant he had "engaged in unreasonably and unnecessarily cruel and brutal treatment of Kelly . . . and Kenneth . . . in that [he] severely beat these children with his belt and with his hands and fists so as to raise severe bruises and welts on the bodies of these children; on numerous occasions he caused each of these children to stand in a corner for long periods of time, sometimes several hours in duration; on occasion he caused each of these children to sleep without bedding on the bare floor, in some instances for periods in excess of one night; and he subjected these children to showers under cold tap water, sometimes lasting as long as 20 or 30 minutes in duration."

In his briefs on this appeal appellant's attorney describes appellant's and Michele's mother's conduct during that period in this manner. "There were regular beatings which resulted in much bruising, standing in the corner for excessive periods and sleeping on the floor without bedding. . . . These two people were uncontrollably embarked on a tragic course of conduct which is known as the 'battered child syndrome.' "

There came a time, after about eight months of the marriage, when Kelly threw some food at the dinner table. We continue with appellant's description of the events which followed. "I reached over and I smacked Kelly right in the face. I mean, just like that. . . . Then about, I guess

about 10:00 o'clock . . . I went in the bedroom where the children sleep and found that Kelly had wet the bed. Well, I became angry with Kelly, literally grabbed her out of the bed, stood her on her feet and more or less pushed her towards going to the bathroom and after that she went to the bathroom and I was right behind her. I told [her mother] to come in there, and she did. She took her off her diaper and I told her, I said, 'Put her in the shower.' She did, and both of us left the room, left Kelly in the shower. . . . [Her mother] went back in the kitchen. Then a short a [*sic*] while I went back in to check on Kelly and found that when I went in there Kelly had defecated in the shower. Well, this made me even angrier with her, so angry, in fact, that I commenced spanking her with my bare hands pretty hard. . . . [T]his went over a period of about—I don't know, two to four minutes perhaps. I just completely lost control of myself. I was furious with her, just furious. I yelled out to [her mother] . . . to come in there. . . . I took her out of the shower myself. I lifted her up out of the tub and laid her on this shag carpeting in the bathroom there . . . . She was crying when I took her out of the tub, crying when [her mother] was in there drying her off. Well, then she started screaming. . . . Evidently Kelly had continued to defecate on the floor while [her mother] was trying to dry her off and put a clean diaper on her. . . . And just as I started to say, just as I got to the entrance to the bathroom after this screaming was started and [her mother] was yelling at Kelly also, but I don't remember exactly what the words were, she had ahold of her by the shoulders, both hands on her shoulders and was shaking her vigorously like this, up, you know, and she was doing this, Kelly's head was hitting the back of—was hitting back down on the rug. . . . Already the bruises had appeared on her where I had struck her and, well, where [her mother] had struck her too. . . . [Sometime later as] I walked by I noticed Kelly here on the floor with [her mother] in the bathroom there. I looked down at Kelly and I said, '. . . what's the matter with Kelly?' because I immediately took note of the fact that she was laying there in a state that appeared to be comatose and not breathing and her eyes were open and not moving and around."

Kelly was dead. Her death "occurred as a result of injuries sustained by her in a beating or beatings . . . which resulted in left basilar (petrous bone) skull fracture with sub-dural hemorrhage, sub-arachnoid hemorrhage and softening of left cerebral hemisphere white matter and further resulted in multi-body bruises and retroperitoneal hemorrhages."

Continuing appellant's narrative: "Here's Kelly all bruised up, obviously dead, and I was quite panicky. We talked about—we can't call

anybody. We can't call the fire department. We can't call the police, can't call anybody because obviously one or both of us would be arrested for this and charged." The couple then placed Kelly's body under a bridge where it was found a few days later.

Twenty-two days after Kelly's death her half sister and appellant's daughter, Michele, was born.

The judgment declaring Michele to be free from the custody and control of appellant was based upon Civil Code section 232, subdivision (a)(4), which provides, as relevant to the appeal, as follows: "(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: . . . (4) Whose parent or parents are convicted of a felony, if the felony of which such parent or parents were convicted is of such nature as to prove the unfitness of such parent or parents to have the future custody and control of the child, . . ."

No complaint is made that the trial's evidence, or the trial court's findings of fact, were insufficient to support the judgment.

Instead, appellant contends that the judgment must fall because Civil Code section 232, subdivision (a)(4), is unconstitutional. His supporting argument is stated as: "Section 232 (a)(4) permits the state to terminate a parent's legal relationship with his child solely because of a criminal conviction. The sole criteria for such a determination is the prior felony conviction and its nature. There is no requirement that the court concern itself with the current parent-child relationship or the *present* fitness of the parent. Such a conclusive, statutory presumption is unconstitutional. . . ."

Civil Code section 232, subdivision (a)(4), must be read and harmonized with another section of the Civil Code. (See *People* v. *Zankich,* 20 Cal.App.3d 971, 980 [98 Cal.Rptr. 387]; *Channell* v. *Superior Court,* 226 Cal.App.2d 246, 252 [38 Cal.Rptr. 13].) The other section is numbered 4600, and it states: "In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding or at any time thereafter, make such order for the custody of such child during his minority as may seem necessary or proper. . . . (c) . . . Before the court makes any order awarding custody to a person or persons other

than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child. . . ."

Read together the two statutes require that the trial court find, not only the commission of such a felony as is described in Civil Code section 232, subdivision (a)(4), but also that an award of custody to the felonious parent "would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." ■ It thus appears that, contrary to appellant's contention, the relevant statutes do concern themselves with "the current parent-child relationship or the *present* fitness of the parent."

Further, we note that the superior court made conclusions of law, which we treat as findings of fact (see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 323(a)(1), p. 3127), as follows: "Michele is a person whose father is convicted of a felony which is of such a nature as to prove his unfitness to have the future custody and control of Michele. . . . [¶] It is in the best interest and welfare of Michele that she be declared free from the custody and control of [her father]. . . . [¶] It would be detrimental to Michele to be placed in the custody of [her father] now or in the future." These findings, in faithful compliance with Civil Code sections 232, subdivision (a)(4), and 4600, were, as pointed out, well supported by the record.

■ The remaining contention of appellant is also found to be invalid. He argues that, contrary to *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], and *In re Tahl,* 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] (cert.den., 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708]), another judge of the superior court had failed to advise him that upon his plea of guilty to Kelly's murder, he would necessarily lose the right to Michele's custody. As we have pointed out, the loss of Michele's custody did not necessarily follow from Kelly's murder; it depended upon future judicial determination. And further: "The law is clear that [under *Boykin* v. *Alabama*] a valid plea of guilty requires that the defendant be made aware of all 'the direct consequences of his plea.' . . . By the same token, it is equally well settled that, before pleading, the defendant need not be advised of all collateral consequences of his plea, or, as one Court has phrased it, of all 'possible ancillary or consequential results which are peculiar to the individual and which may flow from a conviction of a

plea of guilty, . . . .' " (*Cuthrell* v. *Director, Patuxent Institution* (4th Cir. 1973) 475 F.2d 1364, 1365-1366 [cert.den., 414 U.S. 1005 (38 L.Ed.2d 241, 94 S.Ct. 362)]; see also *Wade* v. *Coiner* (4th Cir. 1972) 468 F.2d 1059, 1060; *United States* v. *Sambro* (1971) 454 F.2d 918, 920 [147 App.D.C. 75]; *United States* v. *Ready* (4th Cir. 1972) 460 F.2d 1238, 1239; *Johnson* v. *United States* (9th Cir. 1972) 460 F.2d 1203, 1204 [cert. den., 409 U.S. 873 (34 L.Ed.2d 125, 93 S.Ct. 206)]; *Tindall* v. *United States* (5th Cir. 1972) 469 F.2d 92.) Appellant's loss of Michele's custody was but a "possible ancillary or consequential" result of his guilty plea.

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied January 11, 1977, and appellant's petition for a hearing by the Supreme Court was denied February 11, 1977.