Simpson *v.* Moorhead.

---

W. PERCY SIMPSON et al.

*v.*

CHARLES H. MOORHEAD.

[Filed January 11th, 1904.]

1. When a lessee assigns his lease, and delivers possession of the demised lands to his assignee, he may not subsequently intrude upon them and against the assignee's prohibition occupy them for their only use.

2. Where lands subject to ebb and flow of tides are usable only for shooting of ducks and other game, intrusions day by day upon such lands for the purpose of shooting will be enjoined. The injury suffered by the owner, in the lessening the quantity of game, increasing the danger of accidental shooting and interfering with his exclusive shooting rights, is not adequately remediable in damages.

3. The title to the belt of land lying at high-water mark within the tidal waters of the state, and thence out into the sea or river, so far as there can be any ownership of lands, was originally in the State of New Jersey, in its right as sovereign.

4. Where such lands have been reclaimed by the riparian owners by excluding the tidewater therefrom by erecting a bank, the title thereto became vested in the reclaiming owner, under the local common law of this state, as declared in the case of *Gough* v. *Bell, 3 Zab. 624.*

5. If his lands can be identified, the title of the reclaiming owner is not taken from him by the breaking of the banks, which exclude the tidewater from the reclaimed lands, and the admission of the tidewater, whether the submergence be for a long or a short period.

---

On bill and affidavits, affidavits in reply, and order to show cause for injunction, &c.

*Mr. George Hampton,* for the complainants.

*Mr. William A. Logue* and *Mr. Clement H. Sinnickson,* for the defendant.

GREY, V. C. (orally).

This is quite an interesting case. The complainants are a number of gentlemen who have associated themselves together for entertainment and sport in a gun club, and have acquired, in their private capacity, the ownership of some uplands and also of some considerable quantity of banked meadow, lying in the county of Cumberland. They complain that the defendant, Moorhead, comes upon their lands, of which the meadow part is largely overflowed by the tide at certain portions of the day, and guns for birds which come on the meadow and on waters thereof, and for birds flying over the same, thus interfering with and depriving the complainants of their land and subjecting them to loss by reason of the lessened quantity of game; and also to the danger of accidental shooting, from the increased number of gunners on the lands, and they allege that the defendant declared his purpose to continue so to shoot on their lands and intends so to do. They pray that he may be enjoined from hunting, gunning, shooting, fishing on the said lands or the waters thereof, and from entering thereon for any purpose whatsoever during the term of the complainants' ownership thereof.

The defendant files no answer, but presents affidavits in which he submits his rights and claims, and on them makes a

Simpson *v.* Moorhead.

very strenuous argument that no preliminary injunction ought to go in this case.

The lands described in the bill consists of two classes—one, lands which have been either conveyed or leased to the complainants, giving them the right of shooting, fishing, &c. Some of these were assigned by the defendant himself to one of the complainants, and by him jointly to the other complainants. Another body of land, called the Lodge and Rorer meadow, is not within any of these leases made by the defendant, nor is it claimed to be.

I think I may say at once that no injunction ought to go as to the Lodge and Rorer lands, for there is nothing in the bill or affidavits to show with sufficient certainty where they are. Unless the designation of these lands is given in such manner that the defendant would be apprised of their location with certainty, no injunction ought to issue to restrain him from going thereon.

As to the other portion of these lands, it is admitted that (except the Robbins meadow) it is held by leases assigned by the defendant himself to one of the complainants. The defendant has had these lands in possession, he has transferred his interest to the complainants and obviously knows where they are located. To the portion called the Robbins' part the complainants say they have and claim no right. As to the portion called the Cook meadows the defendant says the complainants have no right, but it appears to be within one of the leases which the defendant himself formerly held and which he has assigned to the complainants.

It is claimed that the terms of these leases, formerly held by the defendant, were mere licenses of a privilege of gunning and fishing, but they are not so expressed in the executed written lease.

The defendant also claims that, though he assigned them, they are not lawfully assignable and therefore the complainants have no right. On looking at the leases I find they are not mere conferences of privileges. The word of grant used is "lease," and that is sufficient to pass a term in the lands demised.

40

It is true, the leases do mention a purpose for which the lands may be used, but they do not prescribe that that shall be the only use to which the lands may be put, and the effect of the leases is to pass title for a term of years in the lands themselves.

So far as the challenge made of the assignability of the leases is concerned, the rule, I believe, is quite well established that, unless a lease of lands expresses on its face a limitation of the power of the lessee to assign it or to sublet the lands demised, the power to assign or to sublet during the term goes to the lessee.

That is a general proposition, applicable to the leases and assignments here under consideration. Therefore, when the defendant, Moorhead, became the holder of the leases in question, he became entitled to assign them. That right he exercised by assigning them to one of the complainants, and for that he was paid money, and has so acknowledged by a writing under his hand and seal. The defendant's counsel has sought to go behind the leases and their assignments and to inquire into the influences and negotiations which induced Mr. Moorhead to make them and to show what he understood to be the rights he was granting. The written contract is not ambiguous and cannot be avoided by parol proof of the antecedent negotiations and conversations.

Mr. Moorhead does not allege that the assignments were made by him by any accident or mistake, or that fraud was perpetrated upon him, leading him to make them. They must stand as the written contract is expressed and cannot be varied by parol testimony.

The complainants insist that the defendant not only intruded on the lands which he had assigned to the complainant, Mr. Simpson, but that he has persistently declared that he intended and had a right so to do.

It is quite clearly shown that he did so intrude and that, at the time he did it, he believed and insisted that he had a right so to do. The proof quite sufficiently shows that, and the argument here made is also on the same lines.

Disregarding the portion known as the Lodge and Rorer meadow and the Robbins' tract, and dealing only with the property which Mr. Moorhead assigned to the parties complainant, it is quite clear to me that he cannot be justified in going upon those lands, the leases of which he has assigned to the complainants. The defendant here and now says that he does not in the future mean to go on the assigned lands. The proof is quite clear that he did, in fact, go on those lands and use them for the only purpose for which they are now usable, and at that time he insisted that he had a right so to use them. Even yet it is argued for him that he has a right to go on these very assigned lands, because the tide ebbs and flows over them. His declaration of his future purpose is in conflict with his claim of right in the premises. At this time and for the next few months the only value of these lands will be the privilege of duck shooting upon them. The defendant has without right exercised this privilege and has insisted he had a right to exercise it for himself and his friends. If he is permitted to do this the complainants will be subjected to additional danger of accidental shooting, to the lessening of the quantity of game on their lands, and to the loss of that which they bought from the defendant himself, the right to possess the demised premises free from the defendant's intrusion. They ought not to be left dependent upon the grace of the defendant, who argues that he has a right to intrude, but at present does not think he will do so. He may again change his mind and conclude to assert his claimed right to go upon the lands under tidewater, even if he has himself sold leases of them which passed to the assignee the right to their exclusive possession.

It is, I think, clearly shown that as against the defendant the complainants have an established right during the terms of the leases assigned to them by the defendant to possess and enjoy for all purposes the meadow lands described in these leases. The situation when the bill was filed exhibited an intent on the part of the defendant to insist on his right to intrude continuously, day after day, on the lands assigned by him, and to shoot ducks and other game thereon now in season.

The injury suffered by the complainants is within the class called irreparable, for which they cannot recover adequate damages at law. To be irreparable, it is not necessary that the money loss shall be so great that it cannot be repaired. The loss which the complainants will suffer is not probably of great money value if the computation be limited to the value of the ducks and other game which the defendant will take. But the acts which he says he has a right to do will deprive them not only of the ducks he may shoot; it will increase the dangers of the sport, invite further and other intrusions, deprive the complainants of the exclusive possession of their property, and will indirectly tend to defeat the whole investment in their sporting club-house and adjacent lands, for if the defendant and his friends may go there at will, so may everyone else.

The question, which has been very interestingly argued here, touching the ownership of the reclaimed meadow lands lying subject to the flow of the tides, and the effect of subsequent submergence, &c., or any other question challenging the complainants' ownership and right of possession, cannot be raised here by the defendant under the peculiar circumstances of this case. The defendant himself is the grantor of those privileges and rights to the complainants which he now disputes. He cannot be heard to deny the effect of his own deed. It is inequitable that he should be permitted to do so.

The counsel for defendant contends that the lands leased by the owners of the meadows have been suffered to go out to the tide, and that this submergence re-establishes the state's title to those lands and justifies all persons in going as they please upon the tidewaters which may cover such lands.

Some of the principles laid down by defendant's counsel regarding such lands are indisputable. One of them is that the State of New Jersey was, in its right as sovereign, the owner of all that belt of land lying at high-water mark within the tidal waters of the state, and thence out into the sea or river, so far as there can be any ownership of lands. That, in substance, is the holding in the leading cases of *Arnold* v. *Mundy, 1 Halst. 1,* and *Martin* v. *Waddell, 3 Harr. 495.*

It is, however, equally indisputable that under the local common law of this state there has from the earliest times existed a right whereby the private owner of lands at high-water mark had the privilege of reclaiming the lands of the state lying under tidewater in front of his ownership, which right, when exercised, vested in such reclaiming owner the title of the state in the lands reclaimed. That was declared by the court of appeals in *Bell v. Gough, 3 Zab. 624*, in 1852. That right (with some limitations as to wharfing imposed by the act of 1851) remained exercisable, at the option of any such owner, up to the time of the passage of the Riparian act, providing a specific plan of acquiring the state's title through riparian commissioners. Under the privilege of reclamation, the owners of lands lying at high-water mark, in front of which the tidewater mud flats were located, reclaimed them from the waters by banking them in. They, by this sort of reclamation, acquired the title of the state to these non-navigable mud flats (now called banked meadows) which lie adjacent to tidal streams. This is plainly shown by many acts of the legislature of this state, arranging for the methods of banking those mud flats as private property, the raising of money therefor by a system of *quasi* taxation of the lands within the bank, and many provisions which clearly recognize private ownership of the reclaimed lands as vested in the owners who had reclaimed them. Many of these statutes are of great antiquity, so ancient as to have been passed in colonial times, preceding the organization of the state itself. Judicial decisions have recognized the validity of these meadow-banking laws, notably the *Pequest River Case, 12 Vr. 175,* in which Chief-Justice Beasley, in view of their great antiquity, refused to consider a challenge of their constitutionality.

The ownership of the title to these banked meadows was thus acquired by the riparian owners from the state and it includes thousands of acres in the counties of Camden, Gloucester, Salem and Cumberland. The meadow company, created under the meadow statutes, consisted of the associated owners of those meadow lands which could be conveniently protected by one bank. In the use of the reclaimed lands the owners often volun-

tarily permit them to be overflowed by the tidewater for their improvement by the deposit of silt and mud. It sometimes happens that the banks break and the tidewater comes over them against the will of the owners, who spend large sums to exclude it immediately, and after exclusion cultivate as before. At other times, although the breaches in the banks letting in the water may have occurred against the efforts of the owners, yet after they have happened the owners permit the lands to be subject to the overflow of the tide, sometimes for short periods, sometimes for long ones. It is this situation which the defendant's counsel insists restores title in the reclaimed lands to the state and subjects them while that overflow continues, to the entry of all the citizens of the state for all purposes of gunning, fishing, &c.

It will, I think, be found that the meadow statutes recognize such overflows and continued subjection to tidewater as incidents of meadow ownership and regulate the method of again erecting the banks, irrespective of the length of time the meadows may have been permitted to remain "out to the tide," the phrase used in South Jersey to describe the overflowed condition. I know of no adjudication which declares that a title to lands, once vested in a private person, is taken from him and given to the state by the fact that tidewater happens to overflow the lands.

The custom in South Jersey (where most of the tide meadows lying in this state are located), as is shown by the meadow-banking book entries in the various county clerks' offices, is to again exclude the tide from the flooded meadows by re-banking them, ofttimes locating the bank in a new place. This is done at any time the owners may choose to put up the banks again. The periods between the going "out to the tide" and the re-banking are often many years.

The theory that mere submergence takes away private title is quite too uncertain to be made the means of changing the ownership of lands. Does the first overflow divest the owner of his title? If not, how many are required to pass a good title to the state? The learned counsel has referred to a particular

piece of banked meadow in which he is himself interested, which has for a long time, because of difficulty in maintaining the banks, subjected the owners to great expense. For several years the tidewater has flowed over it for almost as much of the time as it has been excluded. Can it be said, if the owners be willing to allow a continued overflow until the deposit of mud from the tidewater has raised the bed of the meadow and make more easy the maintenance of the bank, or if they want time to raise more money to pay for the banks, they have lost their title to their lands by submergence in the meanwhile?

The section of the Meadow act (59) referred to by counsel, which enables a majority of the owners to order an overflow, has nothing to do with any change in the ownership of the lands. It is obviously intended to enable a majority of the owners to provide for a temporary overflow. Nothing in that section indicates that if the meadows are overflowed without a majority vote the title to the lands would be affected.

It seems to me to be unquestionable that, if the lands be once reclaimed, the title to such lands remains in the several reclaiming owners whether the tidewater afterwards overflows them or not.

The defendant's doctrine, if applied to the ownership of banked meadow lands, would prevent the private owner from improving them by allowing an overflow and thus securing the advantage of the deposit of mud thereon from the flowing tide. This practice is common wherever such lands are owned; sometimes the owner overflows his meadows every winter, sometimes for several years continuously.

It may, I think, be truthfully said, that in no case has the overflow of such meadows by the tide, whether it happened by accident or design, ever been accompanied by a purpose to abandon the property. Almost invariably, during the period when overflow is permitted, some acts of ownership over the submerged lands are asserted by the owners.

In the case now before me the banked lands, though overflowed by tidewater, were leased by the owners to the defendant, who evidently did not consider them to be abandoned, for he, after

using the lands himself under the leases, has now assigned them to the complainant Simpson for a valuable consideration.

There is a marked difference between the overflow of flats adjoining a river, which almost invariably deposits mud upon them and thus raises their level and improves them for agricultural use, and the action of the sea at the tidewater line, which sometimes deposits an accretion, and at others, by erosion, carries away the fast land, with no known or certain habit of doing either one or the other. In the one case the overflow can be used with certainty for purposes of deposit and improvement, the lands being readily identifiable by their owners on every recession of the tide. In the other the very substance of the fast land may be permanently removed so that no means of marking its bounds may remain.

An interesting discussion of the question may be found in the opinion of the late Chief-Justice Depue in the case of *Ocean City* v. *Shriver, 35 Vr. 550, 556,* in the court of appeals, with a collation of the cases and views of learned writers on the subject. The highest authorities all in substance declare that, if the owner's overflowed land be left again uncovered by the recession of the water, he shall have it as before if he can make out where and what it was, "for he cannot lose his property in the soil though it be for a time become a part of the sea."

Some of the proofs address themselves to the question of the title of the private owner outside of the bank which he has erected. The defendant's counsel claims that the complainants have no right to exclude the defendant from the shore or "guard" which lies between the bank by which the owner has reclaimed and the bed of the tidal stream. I think this is correct. Wherever the line of the bank of the reclaimed land is, that is the line of the private ownership. Whatever privilege of removing mud, &c., for the bank, the owner may take outside of the "guard," without interference from the state, does not give title. He has himself put the limit of the line to which his title runs by his reclaiming bank. If he has been accustomed to exercise a privilege outside of the bank, to take mud to maintain the bank, that is not reclamation, and gives no title

or exclusive right of possession enabling him to exclude other people from the "guard." The line of the ownership of the reclaimed land is the line of reclamation. No injunction should go against the defendant prohibiting him from going upon the "guard" outside of the meadow bank.

There has been an intimation of a disposition to continue this contest until final hearing. If that be done, there will be a much better opportunity, by personal examination of the witnesses, to ascertain the detail of the facts. As they are now shown, the complainants are entitled to a preliminary injunction.

I will allow that writ as above indicated, but I will not award any costs. They may abide the further order of the court.