[Civ. No. 14722. First Dist., Div. One. Nov. 30, 1951.]

JOHN A. BOHN et al., Respondents, v. ROBERT ALBERT-SON et al., Appellants.

Robert L. Mann, Morris M. Grupp and Joseph A. Brown for Appellants.

Carlson, Collins, Gordon & Bold for Respondents.

BRAY, J.—From a judgment granting plaintiffs a permanent injunction, defendants appeal.

## FACTS

Plaintiffs are the lessees of the owners of most of the Frank's Tract in Contra Costa County. These owners are the successors in interests of the original patentees of swamp and overflowed land. In February, 1938, the San Joaquin River broke the levee and flooded the entire tract, including lands leased by defendants. It has remained flooded ever since. From 1938 until the making of the lease in 1947 the defendants and the general public in large numbers have gone on the tract in rowboats, skiffs and pleasure boats and have fished there. Subsequent to the making of the lease, plaintiffs have attempted to bar the public therefrom, charging a fee or license for the privilege of fishing on the tract. Plaintiffs brought this action to quiet their title to the land and the waters thereon. Defendants answered, claiming for themselves and the general public the right of navigation and fishing on and in said waters.

## QUESTIONS PRESENTED

1. In California does a landowner lose title to his land by avulsion?

2. Where, by avulsion, waters inundate land and remain navigable, has the public the right of navigation and fishing in those waters?

3. What are navigable waters?

4. Did the court make a finding on navigability as a fact, and if so, does the evidence support it?

## RECORD AND FINDINGS

Plaintiffs filed a complaint seeking an injunction to enjoin defendants permanently from entering or fishing upon the

premises therein described, referred to generally as "Frank's Tract." Defendants answered severally and each cross-complained against plaintiffs and certain other cross-defendants for an injunction restraining all cross-defendants from interfering with the right of cross-complainant, his agents, employees and customers to use the waters of Frank's Tract for navigation and fishing and for damages for such interference. Certain of the court's findings pertinent here follow. (More detailed findings appear later.) The tract constituted swamp and overflowed land granted to the State of California by the United States government pursuant to the Arkansas Act, passed by Congress September 28, 1850 (U.S. Revised Stats. 2479 to 2484); United States patents were issued to the state for said land on September 13, 1870 and February 8, 1873; said land was granted by the state by valid California patents issued pursuant to an Act of March 28, 1868, entitled "An Act to Provide for the Management and Sale of Lands Belonging to the State"; the cross-defendants, other than plaintiffs, derived title to said land by mesne conveyances from the original patentees of the state and are the owners of said land; the land is situated in Contra Costa County, within the Delta Region, near the San Joaquin River and adjacent sloughs. About the time the California patents were issued it had been fully reclaimed by the construction of levees and surface drainage. From that time until February, 1938, the land was developed for agricultural purposes; homes and buildings were constructed thereon; the land was not upland, frontage or tideland. (The findings concerning the flooding of the land and its effect will be discussed later.) Plaintiffs, in 1947, entered into a lease of said land with the other cross-defendants for 25 years for the purpose of developing it for recreational uses such as boating, hunting, fishing, bathing and other aquatic sports, and have been in possession ever since, attempting to assert their right to its exclusive possession by excluding defendants and the general public therefrom, and licensing users of said land for recreational purposes. Prior to the date of the lease, the owners have permitted defendants and others to use said land and water for recreational purposes and to gain access thereto through breaks in the levees, which use was not under a claim of right, color of title, or adversely to the rights of cross-defendant owners. Defendants have no right to the use of said land and water. The premises have not been reclaimed or used for agricultural purposes since the 1938 break in the levee. Neither the owners nor plaintiffs are

violating any obligation or public trust in connection with further rights to reclaim said lands, and their use thereof is not contrary to the public policy of the state. As conclusions of law the court found that plaintiffs are entitled to exclusive use of the land and waters thereon and that neither defendants nor the general public have any right or interest therein. The judgment followed the findings and conclusions and in addition ordered that defendants take nothing by their cross-complaint. Apparently no appeal is taken from the denial of the prayer of the cross-complaint, so the cross-defendants (other than plaintiffs) do not appear on this appeal, and no further consideration will be given to such denial.

### ORIGINAL TITLE

There can be no question but that the basic character of the land was determined to be swamp and overflowed lands by the "Arkansas Swamp Land Act" of 1850, and the official surveys (*People* v. *Morrill*, 26 Cal. 336; *Edwards* v. *Rolley*, 96 Cal. 408 [31 P. 267, 31 Am.St.Rep. 234]; *Newcomb* v. *City of Newport Beach*, 7 Cal.2d 393 [60 P.2d 825]; *Foss* v. *Johnstone*, 158 Cal. 119 [110 P. 294].) and that when the state conveyed the land to the predecessors in interest of the present owners such conveyances were without express limitation and without express reservation to the state or its inhabitants of the rights of navigation and fishery. ▮ Plaintiffs assume that because there was no express right of navigation and fishing in the patents of their lessors' predecessors, such right was not reserved to the state. Such assumption, however, is erroneous if there were navigable waters on the land at the time of the patents. That such right was reserved, although not expressed in the Constitution or in conveyances of swamp and overflowed lands, has been definitely decided in this state. (See *Forestier* v. *Johnson*, 164 Cal. 24 [127 P. 156]; *People* v. *California Fish Co.*, 166 Cal. 576 [138 P. 79]; *People* v. *Russ*, 132 Cal. 102 [64 P. 111].)

Thus, had there been navigable waters on the lands of Frank's Tract at the time of the patents, the landowners' rights therein would have been subject to the navigation and fishing rights of the public. Apparently there were no navigable waters thereon at that time. But if there are now (assuming that because there were no navigable waters originally plaintiffs' lessors' title was free from restrictions), in determining plaintiffs' rights in those waters, the character of the deposit of the waters thereon and the question of their navigability must be considered.

To determine whether the waters are navigable it is necessary to consider what are the recognized tests of navigability, and then, to examine the findings and the evidence in the light of those tests.

## What Are Navigable Waters?

In *United States* v. *Utah,* 283 U.S. 64, 76 [51 S.Ct. 438, 75 L.Ed. 844], the court said: ''The test of navigability has frequently been stated by this Court. In *The Daniel Ball,* 10 Wall. 557, 563 [19 L.Ed. 999, 1001], the Court said: 'Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.' In *The Montello (United States* v. *The Montello)* 20 Wall. 430, 441, 442 [22 L.Ed. 391, 394], it was pointed out that 'the true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation,' and that 'it would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway.' The principles thus laid down have recently been restated in *United States* v. *Holt State Bank,* 270 U.S. 49, 56 [70 L.Ed. 465, 469, 46 S.Ct. 197], where the Court said: '. . . navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.' ''

■ Navigability ''is largely a question of fact, to be determined from the character of the stream, its situation and availability as a highway of commerce, and the other surrounding circumstances affecting the question.'' (*Mintzer* v. *North American Dredging Co.,* 242 F. 553, 559.)

■ It has been held that navigability is to be determined by the condition at the date of the admission of California to the Union. (*United States* v. *Utah, supra,* 283 U.S. 64 [51 S.Ct. 438, 75 L.Ed. 844]; *Newcomb* v. *City of Newport Beach, supra,* 7 Cal.2d 393.) However, this rule is limited to the title to the lands under the water and riparian rights. Navigability for the purpose of commerce may arise later. (*United States* v. *Appalachian Elec. Power Co.,* 311 U.S. 377,

408 [61 S.Ct. 291, 85 L.Ed. 243].) Thus, if the evidence showed the creation of a new channel of the river, the fact that there was no such channel in 1850 would not prevent the assertion by proper public authority of the right to use that channel for navigation and fishing.

In *State* v. *West Tennessee Land Co.*, 127 Tenn. 575 [158 S.W. 746, Ann.Cas. 1914B, p. 1043], the court was considering the question of navigability on a lake formed as the result of an earthquake, which submerged the land. The lake has an average depth of about seven feet, except along the shore line and at a certain dam and bar. Along the shore line the water is only a few inches deep for several yards out into the lake, and at the dam and bar it is from a few inches to two feet in depth. The lake has both an inlet and outlet. The outlet flows continually but is not of sufficient depth to form a navigable connection with the Mississippi River into which it flows. A government levee prevents the waters of the Mississippi at ordinary tides from flowing in. Before this levee was built the river would overflow into the lake once or twice a year, raising its waters many feet, remaining there until the following late spring or summer. Many people fished in the lake daily, using many small boats, canoes and batteaux. The fish had free access to and from the Mississippi before the building of the levee. In holding the lake to be navigable, the court said (p. 1045 [Ann.Cas. 1914B]) : " 'Navigable rivers are not merely rivers in which the tide flows and reflows, but rivers capable of being navigated; that is, navigable in the common sense of the term.' " (See, also, Ann.Cas. 1914B, p. 1068.) " 'If the river be a public navigable stream, in the legal sense, the soil covered by the water, as well as the use of the stream, belongs to the public. But if it be not navigable in the legal meaning of the term—as is the case in England as to all streams above the flow of the tide—the ownership of the bed of the stream is in the riparian proprietors, but the public have an easement therein, for the purposes of transportation and commercial intercourse.' " (P. 1046.) "Considered in this view, the presence of stumps and trees in the water, although they may prevent present navigation, cannot affect its capacity nor change its classification from that of a navigable body of water in the legal sense to that of one navigable only in the ordinary sense." (P. 1047.) The case then goes on to discuss the situation as to grants made by the State of North Carolina to one Doherty before the lake was formed, and says (p. 1049) : "As these lands were grantable by North

Carolina, and were subject to private ownership before the formation of the lake, we are of opinion that the mere fact that they have since become submerged by a body of navigable water does not deprive the owners of their title to the land as long as they can be reasonably identified.'' The case further holds that the exclusive right of fishing is in the private owners, although they may not detain the fish nor prevent their free movement through the waters of the lake. However, in California we do not have this exclusive private right of fishery in navigable waters. The case is important in demonstrating that an owner does not lose title to his land where there is a sudden covering of the same with navigable waters.

In *Lamprey* v. *State*, 52 Minn. 181 [53 N.W. 1139, 18 L.R.A. 670], the court said (pp. 678, 679 [18 L.R.A.]): ''But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. *Certainly we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.* Many, if not most, of the meandered lakes of this state, are not adapted to, and probably never will be used to any great extent for, commercial navigation; but they are used—and as population increases and towns and cities are built up in their vicinity, *will be still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated.* . . . If the term 'navigable' is not capable of a sufficiently extended meaning to preserve and protect the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put, we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and private waters. But however that may be, we are satisfied that, *so long as these lakes are capable of use for boating, even for pleasure, they are navigable, within the reason and spirit of the common-law rule.*'' (Emphasis added.)

*United States* v. *Appalachian Power Co., supra,* 311 U.S.

377, states that the navigability under consideration is ''navigability despite the obstruction of falls, rapids, sand bars, carries or shifting currents.'' (P. 409.) Again, ''Nor is it necessary for navigability that the use should be continuous.'' (P. 409.) ''Small traffic compared to the available commerce of the region is sufficient.'' (P. 409.) ''It is well recognized too that the navigability may be of a substantial part only of the waterway in question.'' (P. 410.) See, also, *United States* v. *Utah, supra,* 283 U.S. 64 [75 L.Ed. 844], to the effect that impediments such as logs, debris, and shifting sand bars do not necessarily make waters nonnavigable.

In *Bolsa Land Co.* v. *Burdick,* 151 Cal. 254 [90 P. 532, 12 L.R.A.N.S. 275], the situation was much different than in the case at bar. There the waters were completely enclosed within the plaintiff's land. In holding that they were not navigable the court recognized the rule which would have applied were they navigable, stating (p. 261): ''*While it is true, therefore, that one may take fish and shoot birds upon navigable waters, and while it is true also that one may go with boats thereon,* the converse of these propositions is far from being true.'' (Italics added.) The language of the court to the effect that the fact that one might go with a boat on the waters, catch fish thereon, or that the waters ebb and flow, does not necessarily prove navigability, must be considered in view of the peculiar facts of that case.

Likewise, in *Mintzer* v. *North American Dredging Co., supra,* 242 F. 553, where the court said that the mere fact that the tide ebbs and flows in a stream does not necessarily tend to any extent to demonstrate its navigable character (p. 560) the slough in question was one which was not navigable or capable of being navigable. Many of the cases hold that the fact that the tide ebbs and flows is of significance in determining navigability.

### Navigable Water—Evidence and Findings

The court did not expressly find whether the waters are or are not navigable. Its findings as to the character and the use of the waters follow.

''That on or about the month of February, 1938, a break occurred in one of the levees adjacent to said land, causing water to flow into and over said land and inundating portions thereof at varying depths up to six (6) feet; that ever since that date large portions of said land have been and now are covered by water within the boundaries of the levees . . .

"That the water covering a large portion of said land is affected by tidal action due to several breaks in the levees surrounding said land, and said water is deep enough to accommodate skiffs, row boats, and in some portions thereof, larger pleasure craft; that said water covers abandoned farm equipment, stumps of trees, peat bogs, and the uncontrolled use of said land and the water thereon is hazardous and dangerous and requires supervision and control; that it is necessary that said levees be maintained for the protection of adjacent homes and property. . . .

". . . that the land and water thereon are properly the subject of private ownership, and said land is annually assessed and taxed by the County of Contra Costa; that while said water will accommodate pleasure craft as hereinbefore found, said water is not public water of the United States, nor the State of California, and neither the defendants nor the general public have any right to the use of said water for any purpose.

". . . that the use of said land by the owners thereof, plaintiffs herein, or their predecessors in interest, is not contrary to the public policy of the State of California."

Findings on navigability of the waters are necessary. ". . . it is plainly apparent that an express finding of fact as to the effect of these dams, placed in the sloughs tributary to Salt River, upon the navigability of that river, is a material and vital question in the case, and for that reason a direct and specific finding should be made upon it." (*People* v. *Russ, supra,* 132 Cal. 102, 106.)

If the findings are to the effect that the waters are navigable, then, within the rule of the cases herein cited, the right of the public to fish therein is unquestioned. On the other hand, if these findings are to be interpreted to mean that the waters are nonnavigable, then we are compelled to hold that they are completely contrary to the evidence and contradictory to those parts of the findings which state "said water will accommodate pleasure craft"—"said water is deep enough to accommodate skiffs, row boats, and in some portions thereof, larger pleasure craft . . ."

The testimony most strongly in favor of nonnavigability follows: Plaintiff John A. Bohn testified that for the most part the levees are substantial and are holding. Rowboats and small craft do go through holes in the levees. There is a large hole in the levee on the northwest corner of the tract and one on the easterly side. Some of the small holes were

cut fairly recently by individuals. Defendant Robert Albertson testified that in places there are stumps or trees extending from the water. There is no channel through the tract, but "[w]ater wash that leads out to those breaks . . . just . . . overflow of the whole island." Ralph L. Foy, a witness for plaintiffs, testified that his company in 1941 cut one of the breaks in the levee so as to make a shorter way for his peat barges to go from Antioch to the tract. When the tide is out, the average depth of water is about three and a half feet and about seven and a half feet when completely in. Boats drawing over three and a half feet would strike objects on the island itself. There are cross levees, too. Most of the deep places are where peat has been removed. When the tide is flooding and the river is backing up from the bay the water runs into the island from the breaks and on the ebb it runs from the island out into the river. "There is no direct current through the island itself from one break to another" nor are there any well defined channels. There are no currents except right next to the breaks themselves. Joe Thompson testified that the peat barges draw two and a half feet when empty and four and a half feet when loaded. They have to come out on high tide. There are obstructions, even farm machinery. The barges get stuck. He went over the tract with the Army engineers and found no water anywhere over seven to eight feet deep and "that was on almost a four foot tide." There are holes which are deeper than that but that is where the peat has broken loose and come to the surface as constantly goes on.

No one testified that the water, except in a few areas, is ever less than three feet deep. The evidence shows, too, that hundrds of pleasure boats have used the water and many have gone in one way and out the other. In the light of the tests shown in the authorities herein reviewed, it is clear that in spite of obstructions such as tree trunks, farm machinery and low spots, the waters are navigable.

The evidence conclusively shows that the water in its present "natural and ordinary condition affords a channel for useful commerce." (*United States* v. *Utah, supra,* 283 U.S. 64, 76.) While not as yet available for heavy commercial traffic, it is being used by innumerable pleasure and fishing boats, and for the transportation of peat. The situation at Frank's Tract is definitely within the rule of *Lamprey* v. *State, supra,* 18 L.R.A. 670. It is somewhat similar to that in *Forestier* v. *Johnson, supra,* 164 Cal. 24, where Fly's Bay was held

navigable although at low tide the land was nearly all bare, except for a certain channel of which the court said: "It does not appear that there has ever been any occasion for running boats out of the main channels, except for the purpose of hunting." (P. 28.)

The waters being navigable, brings us to the effect of that fact on the title.

## Avulsion

While the parties have discussed at some length, and cited authorities on the legal effect of erosion, or the gradual eating away of the soil, and of the gradual changing of the channel of a river, the principles involved in such situations are not pertinent here. The action of the waters here constituted not an encroachment or erosion or gradual change of the river's channel, but an inundation or avulsion, "not a gradual or imperceptible encroachment on the land but . . . [a] sudden or violent action of the elements, perceptible while in progress." (*Schwartzstein* v. *B. B. Bathing Park*, 203 App.Div. 700 [197 N.Y.S. 490; 492].) There it was held that the owner of land which became inundated by the sudden action of the sea did not lose title to the submerged lands. The court quoted from Hargreaves' Law Tracts. " 'If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or, though the marks be defaced, yet if by situation and extent of quantity and bounding upon the firm land the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject doth not lose his propriety, and accordingly it was held by Cooke and Foster, J. (7 Jac.C.B.), though the inundation continue forty years.' 'But, if it be freely left again by the reflux and recess of the sea, the owner may have his land as before, if he can make it out where and what it was; for he cannot lose his propriety of the soil, though it be for a time become part of the sea, and within the admiral jurisdiction while it so continues.' "

"29 Cyc. 349 thus defines it [avulsion]: 'Avulsion is the sudden and rapid change of the channel of a stream which is a boundary, whereby it abandons its old and seeks a new bed.' Thus we have two distinct ideas; that of bodily tearing a piece of land away from one owner, and adding it to the land of another, so that it can be identified; and that of a sudden and violent change in the channel of a river, regardless of what becomes of the land washed away. . . . 'Where the change in the channel of a river is made suddenly and violently, and

is visible, and the effect certain, it is said to be by avulsion.' ''
(*Wood* v. *McAlpine*, 86 Kan. 804 [118 P. 1060, 1062, 1063].)

The real question here is not of the title to the land but whether by the flooding, the right of navigation and fishing arose in the public. The solution of this question, in turn, depends upon whether the waters on the tract are navigable. If they were not, no rights of the public would attach. (*Bolsa Land Co.* v. *Burdick, supra,* 151 Cal. 254.) ▉ As the waters are navigable, then, although the title to the lands thereunder still remains in the owners and they have the right to reclaim, the public, until the land is reclaimed, has the right of navigation and fishery.

"If a portion of the land of the riparian owner is suddenly engulfed, and the former boundary can be determined or the land reclaimed within a reasonable time, he does not lose his title to it." (Farnham, Waters and Water Rights, vol. 1, p. 331, § 74; see also *Simpson* v. *Moorhead,* 65 N.J.Eq. 623 [56 A. 887].)

In the Simpson case, *supra* (56 A. 887), there was a somewhat similar situation to the one in the case at bar. The plaintiffs owned certain high land in front of which were mud flats. They reclaimed these flats and thereby, under New Jersey law, acquired title thereto. Breaches in the banks of the reclaimed land occurred from time to time permitting the land to be subject to the overflow of the tide. The owners did not repair these breaks. Defendants contended that by thus permitting the land to be overflowed plaintiffs lost their title. To this claim the court said: "The theory that mere submergence takes away private title is quite too uncertain to be made the means of changing the ownership of lands. . . . It seems to me to be unquestionable that, if the lands be once reclaimed, the title to such lands remains in the several reclaiming owners, whether the tidewater afterwards overflows them or not." (Pp. 889, 890; see, also, *Commissioners of Lincoln Park* v. *Fahrney,* 250 Ill. 256 [95 N.E. 194].)

"In general, the rights of the public to the incidents of navigation are boating, bathing, fishing, hunting and recreation. . . .

". . . the right of navigation includes the incidental use of the bottom. This is true where the use of the bottom is connected with navigation, such as walking as a trout fisherman does in a navigable stream, boating, standing on the bottom while bathing, casting an anchor from a boat in fishing, propelling a duck boat by poling against the bottom, walking

on the ice if the river is frozen, etc." (*Munninghoff* v. *Wisconsin Conservation Com.,* 255 Wis. 252 [38 N.W.2d 712, 715, 716].)

In *City of New York* v. *Feltman,* 230 App.Div. 299 [243 N.Y.S. 625], appellants had acquired title to Parcel 35 by reclamation. Thereafter the ocean encroached on and submerged it (whether gradually or by avulsion does not appear). The court said: "The proprietorship of the appellants, Feltman, was lost, subject to a return to that proprietorship by the exclusion of the water, either by natural or artificial means." (P. 628 [243 N.Y.S.].) Before appellants attempted again to reclaim, the city as owner of the upland reclaimed it. Although the court upheld the city's action and it cannot be determined whether the encroachment was actually by avulsion, the case is authority for the proposition that mere submergence does not cause the landowner to lose land without right of reclamation.

*City of New York* v. *Realty Associates,* 256 N.Y. 217 [176 N.E. 171], was an action to condemn certain shore lands for a public beach. The city conceded that the title to the lands originally was in defendant, but contended that it lost that title to the state by the land becoming submerged and not reclaimed. The state had granted to the city any title it might have. The court said (p. 172 [176 N.E.]): "It concedes, however, that the title could have been regained by reclaiming and filling the land under water or even by natural restoration, but insists that, in the absence of either process, title remains with the city as grantee of the sovereign state. Assuming that land lost by erosion returns to the ownership of the state, we think that the same conclusion does not follow the effects of avulsion. In some treatises and even in judicial opinions in other states and in England occur confusing statements which might lead to an inference that in cases of avulsion their writers believed that private title was temporarily lost and was restored only when the waters receded or the land was artificially replaced. In this state the subject may not have been authoritatively settled by any actual decision which required adjudication of this question, but the expressions of opinion by distinguished judges reveal general concurrence in the view that the private owner is not divested even temporarily of his title. . . . We accept this doctrine, and now pronounce it law. The logical deduction from these judicial utterances is that the right to regain the land rests solely on the principle that the title to it remains in the riparian owner. It is not suspended by a physical catastrophe." (See,

also, 65 C.J.S. 186; see discussion in *People* v. *California Fish Co., supra,* 166 Cal. 576, 597, concerning the revocation by the state of the original dedication of the lands for purpose of navigation and fishery.)

It might be pointed out that the rule in Texas is different from that of most of the states. There, where the bed of a river is changed through avulsion, the owner of the land where the river has made a new bed loses his entire title to the state. (*State* v. *R. E. Janes Gravel Co.,* (Tex.Civ.App.) 175 S.W.2d 739.)

### RIGHT TO FISH

In *Diversion Lake Club* v. *Heath,* 126 Tex. 129 [86 S.W. 2d 441], the Medina River was not navigable in fact but was made so in law by statute passed in 1837. In 1912, as part of an irrigation project, the river was dammed in two places so as to form two lakes. The smaller of these, Diversion Lake, covered about 150 acres. Plaintiff in 1926 became the owner of two strips of land each about 1,500 feet in width and four miles in length, fronting on what were originally the two banks of the river. It did not, however, own the bed of the river. Plaintiff fenced its land and stocked it with fish and improved it for the use of its members for fishing, hunting, boating and bathing. Defendants, as Texas citizens, claimed the right to fish and boat in the lake. They had access to it by a public road which crossed the upper end of the lake. In holding that the public had the right to fish, the court said: "In general it is held that all members of the public have a common right of fishing in navigable streams . . . '. . . to . . . those waters that are navigable in fact.'" (P. 444 [86 S.W.2d].) The court referred to the rule that "The right to fish in public water does not carry with it a right to cross or trespass upon privately owned land in order to reach the water." (P. 445 [86 S.W.2d].) While the decision was based on the fact that the plaintiffs did not own the bed of the river, the court held that the public had the right to fish not only in that portion of the lake in which lay the river bed but on the whole of the navigable lake, saying that the waters of the lake, notwithstanding that most of its bed was privately owned, were still public waters. "When the irrigation company, plaintiff in error's predecessor in title, constructed the dam across the river, it caused by its voluntary act the flood waters of the river, public waters, to spread over the land which it had acquired, submerging and in effect destroying a portion of the river bed, and giving to the public waters a new bed. This

artificial change in the river and its bed did not affect the public nature of the waters and did not take away the right of the public to use them for fishing.'' (P. 446 [86 S.W.2d].)

Thus, in our case, the involuntary flooding of plaintiffs' land made a change in the river to the extent of spreading its waters over plaintiffs' land. That fact, as long as the waters remain navigable and are reached by the public without trespassing on plaintiffs' land, does not affect the public nature of the waters.

In *Diana Shooting Club v. Husting,* 156 Wis. 261 [145 N.W. 816, Ann.Cas. 1915C 1148], the question was the right of the public to hunt in a widening of a river, the title to the land thereunder being, by Wisconsin law, in private persons. The court points out that while the states differ with relation to the ownership of the title to land under navigable waters, nevertheless in most states, regardless of title ownership, there is a sovereign right in the people to have all navigable waters forever free for navigation, and ''that the right of navigation carries with it the right of fishing, which is incident to the right to navigate.'' (P. 1150 [Ann.Cas. 1915C].) The court said further: ''Navigable waters are public waters and as such they should inure to the benefit of the public. They should be free to all for commerce, for travel, for recreation, and also for hunting and fishing, which are now mainly certain forms of recreation.'' (P. 1151 [Ann.Cas. 1915C].)

In *Willow River Club* v. *Wade,* 100 Wis. 86 [76 N.W. 273, 42 L.R.A. 305], the court points out how under the common law of England, as a general rule, beds of tidal rivers belonged to the Crown, but that beds of fresh water rivers belonged to the abutting landowners. Then our original 13 states followed that rule, although in some of the states the tidal river rule was extended to certain navigable fresh water rivers. Subsequently when the national government was organized and the Northwestern Territory ceded to the United States by Virginia and the newly formed states acquired lands from the United States, there became quite a conflict in the rules between states, the courts of some holding that the title to the river beds was in the state and others holding it was in private persons. But, because of the sovereign rights of the people, ''notwithstanding the plaintiff has title to the bed of the river, nevertheless it holds the same in trust for the use of the public'' (p. 276 [76 N.W.]). ''The question recurs whether the public right of fishery is included in, or an incident of, such public right of navigation. In other words, has the plain-

tiff, as riparian owner, the exclusive right to take fish from the river? The plaintiff certainly has no property in the particles of water flowing in the stream, any more than it has in the air that floats over the land. Its rights in that respect are confined to their use and in preserving their purity while passing. *Lawson* v. *Mowry*, 52 Wis. [219] 234, 235 [9 N.W. 280]. So, the fish in the stream were not the property of the plaintiff at common law, any more than the birds that flew over its land. *State v. Roberts*, 59 N.H. 256 [47 Am.Rep. 199]; Ang. Water Courses (7th ed.) § 65a, and cases there cited; *State* v. *Welch*, 66 N.H. 178 [28 A. 21]. As indicated, the public right of fishery in tidal rivers was maintained, at common law, in England, before the use of steam,—when vessels could only be carried up the river by the flow of the sea, and down the river by the ebb of the sea,—and consequently when the ebb and flow of the tide practically measured the navigability of the stream. For the same reason, the public should have the right to fish in all the public navigable waters of the state, including all public navigable rivers and streams of the state.'' (Pp. 276-7 [76 N.W.].)

In *Wright* v. *Seymour*, 69 Cal. 122 [10 P. 323], the court in holding that a patent which describes the land as running to a stake on the bank of the Russian River ''then meandering down the Russian River'' did not carry title to the bed of the river, points out that the common law doctrine of title has been modified in some of the states and that ''the right of navigation in all such navigable waters is the paramount public right of every citizen.'' (P. 127.)

In California the right to the fish in a stream is in the people even though the stream be nonnavigable. In *People* v. *Truckee Lumber Co.*, 116 Cal. 397 [48 P. 374, 58 Am.St.Rep. 183, 39 L.R.A. 581], the defendant operated a sawmill on the banks of the Truckee River, which is a nonnavigable fresh water stream, stocked with fish. Defendant in operating its mill allowed sawdust, etc., to pollute its waters. In sustaining an order refusing to vacate an injunction restraining defendant from continuing such pollution the court said: ''The fish within our waters constitute the most important constituent of that species of property common designated as wild game, the general right and ownership of which is in the people of the state (*Ex parte Maier*, 103 Cal. 476, 483 [37 P. 402, 42 Am.St.Rep. 129]), as in England it was in the king; . . .

''But defendant urges that the facts do not show the infringement of any public right, in that the right, if any,

shown to be interfered with is solely that of fishery, or the privilege to take fish; that this is a public right only so far as it pertains to navigable waters, while as to all other waters it is exclusively in the riparian proprietor; that, as the Truckee river is not a navigable stream, the destruction of the fish therein is not an injury to the public for which the people can complain, there being no allegation that the riparian proprietors thereon have been injured.

"In the first place, the common right to take fish extends not alone to navigable waters, but exists as to all waters, the lands underlying which are not in private ownership—in other words, to all lakes, ponds, or streams, navigable or otherwise, upon the public lands of this state or the United States not protected by reservation; and since there is no averment that the lands along the Truckee river are held in private proprietorship, we think the presumption must be that the title remains in the government.

"But, in the next place, if this is not the presumption, the case would not be different. The dominion of the state for the purposes of protecting its sovereign rights in the fish within its waters, and their preservation for the common enjoyment of its citizens, is not confined within the narrow limits suggested by defendant's argument. It is not restricted to their protection only when found within what may in strictness be held to be navigable or otherwise public waters. It extends to all waters within the state, public or private, wherein these animals are habited or accustomed to resort for spawning or other purposes, and through which they have freedom of passage to and from the public fishing grounds of the state. To the extent that waters are the common passageway for fish, although flowing over lands entirely subject to private ownership, they are deemed for such purposes public waters, and subject to all laws of the state regulating the right of fishery. . . .

"For the purposes of the right involved in this action, then, the Truckee river, so far as it flows within this state, is a part of the waters to which the jurisdiction of the state in the protection of its fish supply extends. This court will take judicial cognizance of the fact that the river has its source in Lake Tahoe, a large navigable body of water lying partly in this state, and that it flows thence into the state of Nevada, and empties into Pyramid Lake, also navigable; and the court may also take notice of the fact so common and notorious that between these two bodies of water the river affords, and has from time immemorial, a natural and free highway for the

passage of the fish inhabiting these lakes. Even, therefore, if, as contended by defendant, the lands through which the stream flows are to be presumed, in the absence of contrary averment, to be owned in private proprietorship, it can make no difference as to the right here asserted. While the right of fishery upon his own land is exclusively in the riparian proprietor, this does not imply or carry the right to destroy what he does not take. He does not own the fish in the stream. His right of property attaches only to those he reduces to actual possession, and he cannot lawfully kill or obstruct the free passage of those not taken." (Pp. 399, 400-401.)

While the court there held that the riparian owner of land on a nonnavigable stream has the sole right to fish in the waters on his land, it upheld the rule that the people are the owners of fish in the streams and waters of this state, and stated that even in nonnavigable waters the riparian owner had no right to prevent fish from passing up and down stream.

The evidence in this case shows that Frank's Tract has become a well-defined water course and a part of the San Joaquin River whose waters are not to be classified as mere flood waters, but as navigable waters. (See *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622 [163 P. 1024]; *Miller & Lux* v. *Madera Canal & Irr. Co.,* 155 Cal. 59 [99 P. 502, 22 L.R.A.N.S. 391].)

In *City of Los Angeles* v. *Aitken,* 10 Cal.App.2d 460 [52 P.2d 585], the court referred to the right of the state to regulate, protect and preserve the easement of the public in navigable streams for the purpose of navigation. In *Taylor* v. *Underhill,* 40 Cal. 471, it was stated that no "right to obstruct navigation passes to a purchaser under the laws for the sale of swamp and overflowed land." (P. 473.) "The title to and property in the fish within the waters of the state are vested in the state of California and held by it in trust for the people of the state." (*People* v. *Monterey Fish Products Co.,* 195 Cal. 548 [234 P. 398, 38 A.L.R. 1186]; *People* v. *Stafford Packing Co.,* 193 Cal. 719 [227 P. 485].) In *People* v. *Miles,* 143 Cal. 636 [77 P. 666], defendants were convicted of using a set-net in the Sacramento Slough in violation of law. This slough emptied into the Sacramento River and was about three or four miles in length, about 80 feet wide and 12 feet deep. Except in midsummer this slough drains the back country lands into the river, but in August the water of the slough has no perceptible current. Fish may and do pass freely up and down the slough from the river. The owner-

ship of the lands bordering on the slough did not appear. However, the court held upon the authority of *People* v. *Truckee Lumber Co., supra,* 116 Cal. 397, that to the extent that the waters are common passageway for fish, although flowing over lands entirely subject to private ownership, they are deemed public waters and subject to all of the laws of the state regulating the right of fishing and that "Whether or not the water of this slough, at the particular time defendants had their net set across it, was subject to movement by current or tide, is immaterial." (P. 642.)

" 'The interest of the public in the waters and bed of a navigable river is analogous to that of the public in a public road. It has the right of passage over the stream as it had over the road. . . . When, by reason of natural changes, the stream abandons the bed over which, through the instrumentality of its waters, the public has the right to pass, the right of passage is as effectually abandoned at that point as when a road is vacated and a new one opened to take its place. The right of the public is to travel in the new road and its right and privilege to pass over the old one revert to the abutting owners, and so with the river, the public right of navigation attaches to the new channel of the stream by virtue of the change of its waters, over which alone the right of navigation can exist . . .' "(*Thies* v. *Platte Valley Public Power & Irr. Dist.,* 137 Neb. 344 [289 N.W. 386, 387-8].)

In *Hume* v. *Rogue River Packing Co.,* 51 Ore. 237 [92 P. 1065, 31 L.R.A.N.S. 396, 131 Am.St.Rep. 732], plaintiff claimed by grant, custom, usage and prescription the exclusive right to take salmon on 18 miles of the Rogue River, a navigable stream. His grant was of all tidelands for four or five miles along the river. The court denied his claims. As to the claim of title by grant, it held that if he had ever had any title to the bed of the river he lost it through the *gradual* shifting of the river submerging his tideland. (In the respect that the submergence was gradual the case differs from ours. However, the case is important in its discussion of the right of fishery in navigable waters.) " 'There is an exception to the rule that the fishery follows the soil in case the soil lies under water in which the public has a right of fishing.' . . . Even where a mere right of fishery in public water has been conferred by the sovereign, it will not be regarded as exclusive, in the absence of anything to indicate an intention to make it exclusive, although the title to the soil is also in the grantor." (92 P. at p. 1068.)

Similarly to the plaintiffs in our case, the plaintiff there contended that the deeds from the state to the tidelands expressly gave him the right of fishery because there were no restrictions therein. At the time, the Oregon law provided that grants should not be construed as granting exclusive rights to oysters and other shellfish. Plaintiff contended that because of no restrictions in his *deed* and particularly because the only restriction in the express *law* was as to shellfish, there could be no restriction as to his right of fishery. However, the court said (p. 1069): " 'A grant of an exclusive right of fishery in a public water is in derogation of common right, and must be expressly mentioned to vest in the grantee. No such right will pass by implication.' 2 Farnham [on Waters, § 1379], *supra*. No language being found in plaintiff's deeds from the state which by unavoidable construction imports an intention to grant an exclusive right to fish for salmon in the water opposite and adjacent thereto, it follows that he does not have that right by virtue of his tide land deeds."

## TAX SALES AND DEEDS—FINDINGS

To sum up, the waters of Frank's Tract are navigable until reclamation is made. The title is subject to the right in the public of navigation and fishing, because, by the sudden flooding of the tract by the San Joaquin River the rights of the public in the river are transferred to the waters of the tract. The title to the lands underlying the waters is not lost, and the owners have the right to reclaim. Plaintiffs, until the land is reclaimed, have no right to prevent the public from fishing on, or navigating these waters, provided the public can do so without trespassing on plaintiffs' land.

In view of our determination that regardless of the prior title of plaintiffs' lessors to the land, the rights of the public as herein set forth have attached to the waters, it is unnecessary to discuss the contention of defendants that the tax sales and deeds had the effect of restricting the title to that extent. Nor is it necessary to discuss the questions raised by defendants concerning the findings.

The judgment is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied December 29, 1951, and respondents' petition for a hearing by the Supreme Court was denied January 28, 1952.