[Civ. No. 46381. Second Dist., Div. Three. Sept. 25, 1975.]

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
CRAWSHAW MORTGAGE AND INVESTMENT
COMPANY, Defendant and Appellant.

COUNSEL

Frederick J. Kling for Defendant and Appellant.

Burt Pines, City Attorney, Thomas C. Bonaventura, Assistant City Attorney, and Richard A. Dawson, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

**FORD, P. J.**—Respondent, the City of Los Angeles (hereinafter the City), brought suit to collect delinquent business taxes alleged to be owed by appellant, Crawshaw Mortgage and Investment Co., a corporation (hereinafter Crawshaw), in the amount of $2,336.07 plus interest and penalties. By its answer Crawshaw denied liability for the claimed delinquent taxes, maintaining that Los Angeles Municipal Code section 21.108 is unconstitutional as applied to it. Judgment was entered in favor of the City. Crawshaw appeals from the judgment.

Crawshaw contends that "Section 21.108(b) Los Angeles Municipal Code creates an arbitrary and impermissible classification of persons for the purpose of raising revenue by means of unequal taxation." Los Angeles Municipal Code section 21.108 provides in pertinent part as follows: "(a) Subject to the exceptions stated hereafter, for each person engaged in the business of lending money, advancing credit, or lending credit or arranging for the loan of money or advancing of credit or lending of credit for and on his own behalf or on behalf of any other person as principal, agent or broker, whether security of any kind is taken for such loan or advance or not; or purchasing or discounting or arranging for the purchase or discounting of any obligation or evidence of money due or to become due, whether such obligation or evidence is secured, guaranteed or not, and whether the person so purchasing or arranging for the purchase of the items aforesaid acts as principal, agent or broker, the tax shall be $750.00 per year. [¶] (b) The tax imposed under the provisions of subsection (a) shall not apply to the business of lending money or advancing credit or arranging for the loan of money or the advancing of credit as principal or agent, where the obligation to repay the money lent or debt incurred or to compensate for the advance of credit is secured by a lien on real property, or some interest in real property; nor shall the provisions of this section apply to the business of

purchasing, either as principal or agent, any debt or evidence of debt secured by any lien upon real property; nor shall the provisions of this section apply to any transaction involving the purchase or sale of real property. All persons engaged in businesses such as are described in this subsection shall be subject to tax under Section 21.190."[1]

Marvin J. Ree, president and sole shareholder of Crawshaw, testified that Crawshaw is engaged in "the mortgage banking business," which consists of "[m]aking real estate loans on real estate of various kinds and quantities, . . . [placing] loans for a fee or a commission and servicing loans for various Eastern investors." Crawshaw does not dispute the trial court's finding that "Defendant [Crawshaw], during all periods of time material hereto, engaged in business as a mortgage banker and a lender of money with real property taken as security, within the City of Los Angeles," or that Los Angeles Municipal Code section 21.108(b) was applicable to it. ■ However, Crawshaw contends that the distinction drawn in Los Angeles Municipal Code section 21.108 between money lenders who make loans secured by real property and those who make loans not secured by real property is an unjust discrimination violative of the equal protection clause of the Fourteenth Amendment.

In *Bilyeu* v. *State Employees' Retirement System*, 58 Cal.2d 618 [24 Cal.Rptr. 562, 375 P.2d 442], the Supreme Court stated at page 623: "There is no constitutional requirement of uniform treatment, but only that there be a reasonable basis for each classification. In *Sacramento Mun. Util. Dist.* v. *Pacific Gas & Elec. Co.*, 20 Cal.2d 684 [128 P.2d 529], we said at page 693: 'Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it.' "

The power of a municipality to classify for the purpose of taxation is broad. Thus in *Fox etc. Corp.* v. *City of Bakersfield*, 36 Cal.2d 136 [222 P.2d 879], at pages 141-142, the court stated: "We do not think the city overstepped constitutional limitations in its classification. It must be remembered that, as aptly expressed in speaking of the state sales tax, by

---

[1]The tax imposed by Los Angeles Municipal Code section 21.190 is based on gross receipts of the taxed business.

the court in *Roth Drug, Inc.* v. *Johnson,* 13 Cal.App.2d 720, 733 [57 P.2d 1022]: 'The power of the states to make classifications of persons or property for the purpose of taxation is very broad . . . A statute is presumed to be constitutional until the contrary appears. It has been said that an act may not be held to be unconstitutional merely because it may contain provisions which seem to be unjust or oppressive, or because it may be deemed to violate the natural, social or political rights of citizens, unless it appears that those features of the act contravene rights which are guaranteed by the Constitution. (1 Cooley's Constitutional Limitations, 8th ed., p. 341.) If a classification of persons or occupations made for the purpose of imposing taxes is founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation and otherwise, they will be deemed to be valid and binding. (5 Cal.Jur., p. 824, sec. 188) . . . While the classification should be reasonable, natural and just, in the absence of a showing to the contrary, it will be assumed there are good grounds for the classification and the act will be upheld. (6 R.C.L., p. 378, secs. 369-376.) In the case of *People* v. *Monterey Fish Products Co.,* 195 Cal. 548, 556 [234 P. 398, 401, 38 A.L.R. 1186], it is said in that regard: "When a legislative enactment is attacked upon this ground—of an unauthorized classification—all presumptions and intendments are in favor of the reasonableness and fairness of the legislative action (5 Cal. Jur., sec. 628 et seq., and cases cited), and the decision to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary." ' [¶] It is well settled that occupations and businesses may be classified and subdivided for purposes of taxation, and it is within the discretion of the Legislature to exact different license taxes from different classes or subclasses of businesses, subject only to the limitations of the state and federal Constitutions in regard to equal protection of the laws. No constitutional rights are violated if the burden of the license tax falls equally upon all members of a class, though other classes have lighter burdens or are wholly exempt, provided that the classification is reasonable, based on substantial differences between the pursuits separately grouped, and is not arbitrary. [Citations.]" (See *Associated Home Builders, etc., Inc.* v. *City of Newark,* 18 Cal.App.3d 107, 109-110 [95 Cal.Rptr. 648].)

Mr. Ree testified in some detail as to the nature of Crawshaw's business.[2] A portion of his testimony was as follows: "We would make,

---

[2]Mr. Ree described his occupation as being that of "a mortgage banker." In response to a question as to how long he had been a mortgage banker he stated: "I have worked in the mortgage banking profession ever since 1949, which is approximately twenty-five years."

for instance, FHA or VA loans in various parts of the City of Los Angeles or in Southern California, and upon the closing of these loans through the use of a warehouse line of credit with one of the banks, we would perfect those loans to the point where they are then marketable to an Eastern investor.[3] We would probably have a commitment of some kind from the Eastern investor which would indicate they would purchase the loan upon the completion of the signing of the documents, the title policy being in the file, and either the guarantee or the insurance from the respective agency, such as the FHA or VA. At that point the loan is ready for shipment to this investor, and we would then purchase it and pay off our warehouse line of credit at the bank."

Mr. Ree further testified that after a loan had been sold to an Eastern investor, Crawshaw would service the loan, a procedure which he described as follows: "The servicing then consisted of, after this purchase of the loan by the investor, we would continue to collect the payments on behalf of that investor each month and make the proper deposits in the trust account for that particular investor and retain a servicing fee for doing this work, and remit the net balances each month to the Eastern investor."

Mr. Ree explained that Crawshaw realized income at several different stages: Crawshaw realized "income at 3 points" as a commission for making the original loan; Crawshaw also realized income in the interest earned during the time that Crawshaw's money was involved in the loan and in the servicing fee charged by Crawshaw after the loan had been sold. Crawshaw also realized income in the form of charges for late payments in connection with its activity in servicing loans.

Crawshaw also made construction loans on "[c]ommercial and industrial and income producing properties." Mr. Ree testified that the construction loans produced income in approximately the same manner, "the loan fee, the interest on your money, and finally the servicing income when the loan was placed elsewhere."

Mr. Ree testified that "at times we had something in the neighborhood of sixty people working in the servicing—loan servicing area." He also testified that Crawshaw had "probably" another five or six people working on the production and processing of loans—that is, employees

---

[3]Mr. Ree testified that in making reference to "Eastern investors" he meant "typically insurance companies or savings and loans."

who originated loans "both in the category of the commercial and industrial areas as well as the FHA and VA areas." With respect to employees of Crawshaw who worked at originating construction loans, Mr. Ree testified that they would have to have special training or experience, a part of his testimony being as follows: "Well, generally speaking they have either been active as real estate brokers, real estate salesmen, or have been trained in the appraisal profession to recognize and understand and value income producing type properties."

With relation to construction loans, which were generally "never less than $100,000.00 and . . . typically in the range of $150,000.00," Mr. Ree testified that Crawshaw made progress payments. Accordingly, it was necessary to have qualified employees to inspect the physical progress at the construction site.

In its answers to interrogatories (that part received in evidence by the trial court) the City stated that the following differences sustained the separate classifications in subsections 21.108(a) and 21.108(b): "Differences include personnel qualifications and training, capital requirements, the way customers are obtained, the amount of the loans involved, the length of time the loans run, the accounting differences, physical facilities, the risk of loss, insurance and inspection considerations, method of obtaining investment money, and police regulations."

In the light of the evidence in the present case it is clear that the mortgage banking business as transacted by Crawshaw is considerably different from that of lending money where real property is not involved as security. There are, of course, differences in the amounts of money usually involved in the two types of business. Furthermore, the mortgage banking business requires more diverse and specialized knowledge and skill on the part of its employees than does the business of making loans not secured by real property. Although each type of business is within the general category of money lending, it has been held that differences in conducting businesses in the same general category are sufficient to sustain different classifications for the purpose of taxation.

In *City of San Mateo* v. *Mullin,* 59 Cal.App.2d 652 [139 P.2d 351], a San Mateo ordinance required that persons engaged in businesses, trades, callings and professions, including that of attorney-at-law, pay an annual license tax. The ordinance was amended to provide that where two or more persons of like businesses, trade, calling or profession are associated as partners, or as employer and employee, then an additional

license tax in a less amount shall be paid for each additional person after the first. The trial court found the tax to be discriminatory and unconstitutional. However, on appeal the judgment was reversed. The appellate court stated as follows (59 Cal.App.2d at pp. 654-656): "In the imposition of the tax herein—a municipal affair—the municipality, unless prohibited by statute, has the right and power to impose the tax, not for the purpose of regulating the conduct of defendant's practice, but for revenue. [Citations.] . . . [¶] . . . Many other instances might be mentioned, but the requirement of constitutionality must in each case be met by demonstrating that the classification is not oppressive against persons or classes. [Citation.] [¶] A difference in the method of conducting a business is generally a sound basis for classification, particularly if it appears that the tax was fixed in proportion to the amount of business, which may be determined by different but reasonable methods. (*Ex parte Lemon*, 143 Cal. 558 [17 P. 455, 65 L.R.A. 946].) . . . The method of operation resulting in superior or more convenient service furnishes a reason for a distinct and separate classification. The power to license a business for the purpose of revenue involves the right to make distinctions between essentially different methods of conducting the same general character of business."

The court further stated in *City of San Mateo* v. *Mullin, supra,* 59 Cal.App.2d 652, at pages 658-659: "In reaching the conclusion that the license tax herein is not unconstitutional, we have been guided by the rules set forth by the Supreme Court of this state and the Supreme Court of the United States. In *Ex parte Haskell, supra*, p. 417 [112 Cal. 412 (44 P. 725)], the court said: 'The very power to license for purposes of regulation and revenue involves the right to make distinctions between different trades and between essentially different methods of conducting the same general character of business or trade.' '. . . legislatures possess the greatest freedom in classification.' (*Madden* v. *Kentucky, supra,* p. 88 [309 U.S. 83 (84 L.Ed. 590, 593, 60 S.Ct. 406, 125 A.L.R. 1383)].)"

In *Web Service Co.* v. *Spencer,* 252 Cal.App.2d 827 [61 Cal.Rptr. 493], the court had before it provisions of the Anaheim Municipal Code which imposed a license tax on the "business of leasing, letting the use of, renting or maintaining any machine or device which . . . upon the insertion of any coin . . . performs any services." The rate of the tax was $1.00 per machine per year or, at the election of the person carrying on the business, a tax measured by gross receipts from business done within the City of Anaheim, or a minimum of $25. The ordinance also provided that a separate license must be obtained for each location where the

business was transacted. The petitioner furnished and maintained coin-operated laundry machines in about 250 locations, such as apartment houses, motels and trailer courts. The coin-operated laundry machine business was also conducted in laundromats, where typically 30 or so laundry machines would be located at a single location for use by the general public. Petitioner argued that it was denied equal protection because the $25 minimum per location precluded it from using gross receipts as its measure of tax. The appellate court stated the problem as follows (252 Cal.App.2d at p. 832): "In reality, petitioner claims the route operator and the 'laundromat' operator are engaged in the same business; the tax ordinance, as enforced by the city, in practical effect, applies one measure of tax to the 'laundromat' operator and another measure to the route operator resulting in the imposition of a higher tax upon the latter; and in this manner, as a route operator, it is denied equal protection of the law."

In upholding the validity of the tax in the Anaheim case, the court stated (252 Cal.App.2d at pp. 833-835): "The equal protection guarantee of the Constitution does not impose a rigid rule of equality in tax legislation; permits a classification of businesses for tax purposes providing the classification is not arbitrary; and, subject to the limitations hereinafter noted, does not foreclose the use of different tax rates, or different methods of tax computation, for businesses in different classifications. [Citations.] [¶] Thus a municipality may impose license taxes in different amounts on different classes or subclasses of business providing the classifications adopted are based on distinctions that are reasonably related to the object of the taxing ordinance [citations]; the tax imposed applies to all businesses within the classification [citations]; and the difference in the taxes is not unreasonably discriminatory, confiscatory or used as a subterfuge to eliminate competition. [Citations.] [¶] Where the tax is imposed upon all members of a class or subclass the ordinance imposing such is valid even though the amount charged is a greater burden on one business than on another. [Citations.]"

Crawshaw cannot successfully argue that it has been harmed because the City has chosen to use a different method of computing the tax levied against the business of mortgage banking than it has for the business of making loans not secured by real property. In *Willingham Bus Lines, Inc. v. Municipal Court,* 66 Cal.2d 893 [59 Cal.Rptr. 618, 428 P.2d 602], a charter bus line argued, among other things, that a city business license tax was invalid on the ground that other businesses, including other vehicles for hire such as taxis, automobiles for hire, etc., are taxed not

upon apportioned gross receipts but upon other bases. The Supreme Court upheld the ordinance, stating (66 Cal.2d at pp. 897-898): "The plaintiff has not attempted to establish that these disparate formulae for taxation work a concrete hardship upon charter bus lines; the equal protection argument must therefore stand or fall with the novel proposition that a municipality is powerless to employ more than one method of computing taxes for various businesses unless it can demonstrate some compelling justification for doing so. [¶] So narrow a view of municipal power, and so expansive a reading of the equal protection clause, would require a radical departure from the settled breadth of legislative authority to draw distinctions for purposes of taxation. [Citations] [¶] The proposed departure from precedent seems particularly inappropriate today. 'As our social and economic life grows in complexity, legislation necessarily increases in the differentiation of its techniques and in the specialization of its objectives.' (*Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control* (1966) 65 Cal.2d 349, 364 [55 Cal.Rptr. 23, 420 P.2d 735].) Now, more than ever, courts must not burden those who formulate tax policy with Procrustean requirements of absolute equality."

In view of the essential differences in the methods of conducting the mortgage banking business and the business of making loans not secured by real property it cannot be said that the distinction between the two types of businesses for the purpose of taxation embodied in Los Angeles Municipal Code section 21.108 is arbitrary or unreasonable. We hold that with respect to Crawshaw the challenged portion of the ordinance does not constitute a deprivation of equal protection of the law.

■ Crawshaw contends that the trial court committed prejudicial error when it sustained the City's objection to certain documentary evidence sought to be introduced by Crawshaw. The excluded evidence was as follows: 1. Exhibit A-1, portions of the City's answers to interrogatories pertaining to the legislative history of Los Angeles Municipal Code section 21.108; 2. Exhibit B, a city council file, which consists of three letters addressed to the ways and means committee of the city council attacking the ordinance; 3. Exhibit C, city council file No. 74342, dated 1956 and containing a report of the city clerk dated July 6, 1958; and 4. The report of the city administrative officer dated April 21, 1972, attached as exhibit B to the City's answers to interrogatories.

We have before us the portions of the interrogatories relating to the legislative history of section 21.108 which the trial court excluded. They consist primarily of a list of additions and changes made by the city

council with respect to Municipal Code section 21.108. Nothing in the answers to interrogatories relating to the legislative history of section 21.108 sheds any light on the question of the reasonableness of the legislative classification embodied in that section.

The original city council files have been lodged with this court. Our examination of the pertinent portions of those files leads us to the conclusion that they could lend little aid to the determination required in this case. Exhibit B consists of three letters from taxpayers attacking the ordinance in question. The letters were written in 1936 and constitute hearsay declarations. The opinions of taxpayers are not pertinent to the validity of the council's legislative classification claimed to be a deprivation of equal protection. Exhibit C contains a city clerk's report dated July 6, 1958, that questions the wisdom of section 21.108. We reiterate that the fact that people, including governmental officials, have objected to an ordinance does not shed light on the validity of the legislative classification of which complaint is made. Further, we note that the material sought to be introduced is quite old. ▮ A challenged legislative classification must be analyzed in terms of the circumstances and conditions existing at the time of the challenge. Such classification may be discriminatory or nondiscriminatory, depending on current conditions. (Cf. *Gawzner Corp.* v. *Minier*, 46 Cal.App.3d 777, 789-790 [120 Cal.Rptr. 344].)

▮ The city administrative officer's report dated April 21, 1972, discusses three alternatives proposed to reduce the tax burden for businesses classified under section 21.190. The report does not discuss the classification established in section 21.108, subdivision (b).

But even if the trial court could be said to have erred in excluding the documentary evidence, it is manifest that no miscarriage of justice resulted. (Cal. Const., art. VI, § 13.)

The judgment is affirmed.

Allport, J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 20, 1975.